UNION PACIFIC RAILWAY COMPANY *et al.*[1] *v.* CHICAGO, ROCK ISLAND AND PACIFIC RAILWAY COMPANY.

UNION PACIFIC RAILWAY COMPANY *v.* CHICAGO, MILWAUKEE AND ST. PAUL RAILWAY COMPANY.

APPEALS FROM THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH CIRCUIT.

Nos. 157, 158. Argued April 21, 22, 1896. — Decided May 25, 1896.

Railroad corporations possess the powers which are expressly conferred by their charters, together with such powers as are fairly incidental thereto; and they cannot, except with the consent of the State, disable themselves from the discharge of the functions, duties and obligations which they have assumed.

The general rule is that a contract by which a railroad company renders itself incapable of performing its duties to the public or attempts to absolve itself from those obligations without the consent of the State,

---

[1] The other party was *The Omaha and Republican Valley Railway Company.*

or a contract made by a corporation beyond the scope of its powers, express or implied, on a proper construction of its charter, cannot be enforced, or rendered enforceable by the application of the doctrine of estoppel; but where the subject-matter of the contract is not foreign to the purposes for which the corporation is created, a contract embracing whatever may fairly be regarded as incidental to, or consequential upon, those things which the legislature has authorized, ought not, unless expressly prohibited, to be held by judicial construction to be *ultra vires.*

The contract with the Rock Island Company on the part of the Union Pacific Company which forms one subject of this controversy was one entirely within the corporate powers of the latter company, and, throughout the whole of it there is nothing which looks to any actual possession by the Rock Island Company of any of the Union Pacific property beyond that which was involved in its trains being run over the tracks under the direction of the other company; and this was an arrangement entirely within the corporate powers of the Union Pacific Company to make, and which was in no respect *ultra vires.*

The common object of the act of February 24, 1871, c. 67, regarding the construction of a bridge across the Missouri at Omaha, and the act of July 25, 1866, c. 246, touching the construction of several bridges across the Mississippi, was the more perfect connection of the roads running to the respective bridges on either side; and being construed liberally, as they should be, the scheme of Congress in the act of 1871 was to accomplish a more perfect connection at or near Council Bluffs, Iowa, and Omaha, Nebraska.

It being within the power of the Union Pacific Company to enter into contracts for running arrangements, including the use of its track and the connections and accommodations provided for by the contract in controversy, and that contract not being open to the objection that it disables the Union Pacific Company from discharging its duties to the public, it will not do to hold it void, and to allow the Union Pacific Company to escape from the obligations which it has assumed, on the mere suggestion that at some time in the remote future a contingency may arise which will prevent it from performing its undertakings in the contract.

Other objections made on behalf of the Union Pacific Company disposed of as follows : (1) The provision in the contract respecting reference does not take from the company the full control of its road; (2) Its acts in constructing its road in Nebraska, not having been objected to by the State, must, in the absence of proof to the contrary, be deemed valid; (3) The contract is not to be deemed invalid because, during its term, the charter of the Rock Island Company will expire; (4) The Republican Valley Company, being a creation of the Pacific Company, is bound by the contract; (5) The Pacific Company has power, under its charter, to operate the lines contemplated by these contracts, it being a general principle that where a corporate contract is forbidden by a statute or is obviously hostile to the public advantage or convenience, the courts dis-

approve of it, but when there is no express prohibition and it is obvious that the contract is one of advantage to the public, the rule is otherwise.

The contracts in question were in proper form; signed and executed by the proper executive officers; attested by the corporate seal of the Union Pacific Company; approved and authorized by the executive committee, which had all the powers of the board; and ratified, approved and confirmed by the stockholders at their next annual meeting: and this was sufficient to bind the Union Pacific Company, although no action by the board was had.

These contracts were such contracts as a court of equity can specifically enforce, and thereby prevent the intolerable travesty of justice involved in permitting parties to refuse performance of their contracts at pleasure, by electing to pay damages for the breach.

The public interests involved in these contracts demand that they should be upheld and enforced. It is to the higher interest of all, corporations and public alike, that it be understood that there is a binding force in all contract obligations; that no change of interest or change of management can disturb their sanctity or break their force; but that the law which gives to corporations their rights, their capacities for large accumulations, and all their faculties, is potent to hold them to all their obligations, and so make right and justice the measure of all corporate as well as individual action.

THESE were petitions in equity filed by the Chicago, Rock Island and Pacific Railway Company against the Union Pacific Railway Company and the Omaha and Republican Valley Railway Company; and by the Chicago, Milwaukee and St. Paul Railway Company against the Union Pacific Railway Company in the District Court of Douglas County, Nebraska, January 2, 1891, to compel the specific performance of two contracts dated May 1, 1890, and April 30, 1890, respectively, and removed on petition of the Union Pacific Railway Company to the United States Circuit Court for the District of Nebraska, where they were heard by Mr. Justice Brewer, and decrees rendered in favor of complainants. 47 Fed. Rep. 15. From these decrees defendants appealed to the United States Circuit Court of Appeals for the Eighth Circuit, by which they were affirmed. 10 U. S. App. 98. Thereupon these appeals were prosecuted.

To the contract of May 1, 1890, the Union Pacific Railway Company, the Omaha and Republican Valley Railway Company and the Salina and Southwestern Railway Company

were parties on one side and the Chicago, Rock Island and Pacific Railway Company and the Chicago, Kansas and Nebraska Railway Company on the other; and the contract of April 30 was between the Union Pacific Railway Company and the Chicago, Milwaukee and St. Paul Railway Company.

The Union Pacific Railway Company controlled and operated more than five thousand miles of railroad, and, among others, a main line extending from Council Bluffs, Iowa, by way of Omaha and Valley Station, Nebraska, to Ogden in Utah Territory, a distance of about eleven hundred miles; a main line from Kansas City, Missouri, by way of Topeka and Salina, Kansas, to Denver, Colorado; the Republican Valley railroad extending from Valley Station, Nebraska, by way of Lincoln and Beatrice, in that State, to Manhattan, Kansas; the Salina railroad extending from Salina to McPherson, in Kansas; and a railroad extending from Hutchinson, in Kansas, to the southern border of that State; and other auxiliary roads.

The Rock Island Company owned and operated a line of railway extending from Chicago by way of Davenport to Council Bluffs, Iowa, and from Davenport to St. Joseph, Missouri. As the owner of the latter line and lessee of the Chicago, Kansas and Nebraska Railway Company and other corporations, it controlled and operated a through line of railway from Chicago by way of Davenport, St. Joseph and Beatrice, Nebraska, to Colorado Springs and Denver, Colorado; and a line from St. Joseph, Missouri, by way of Horton, Topeka and Hutchinson to Liberal, Kansas, and other lines, amounting in the aggregate to more than three thousand miles of railway.

The Union Pacific Railroad owned nearly all of the stock and bonds, elected the directors and built, controlled and operated the railroads of the Republican Valley and Salina Companies, and the Rock Island Company owned and operated the roads of the Kansas Company under a lease for nine hundred and ninety-nine years, so that the Pacific Company and the Rock Island Company were practically the real parties in interest to the contract of May 1.

The St. Paul Company was operating more than six thousand miles of railroad, and one of its lines extended from Chicago to Council Bluffs, Iowa.

The following sketch roughly indicates the domain of the contracts:

Early in 1890 the Rock Island Company determined to connect its lines from Chicago to Council Bluffs with its southerly line to Colorado Springs by constructing a bridge across the Missouri River at Council Bluffs and a railroad from that terminus, by way of Omaha and South Omaha and Lincoln to Beatrice, Nebraska, thereby shortening its line from Chicago to Denver and Colorado Springs; and the St. Paul Company joined in the undertaking in order to extend its line from Council Bluffs on to Omaha and South Omaha. Acting in concert the two companies caused a corporation to be created under the laws of the State of Iowa by the name and style of the Nebraska Central Railway Company, with power to build a bridge across the river at Omaha and one or more lines from that city west. Congress granted to this corporation the necessary franchise for the bridge. 23 Stat. 43. Preliminary surveys and estimates were made which showed that the entire cost of the bridge and tracks to South Omaha would be about two and one half million dollars. In February, 1890, the presidents of the St. Paul and Rock Island Companies visited New York for the purpose of arranging for the construction of the proposed work, when the Pacific Company requested them to suspend operations, and proposed to make a trackage arrangement with them by which they could use the bridge and tracks of the Pacific Company between Council Bluffs and South Omaha for their terminal facilities in Omaha and South Omaha, and the continuous line desired by the Rock Island Company could be completed. By direction of the president and at least two directors of the Pacific Company, its chief of construction and two of its directors obtained a meeting with the presidents of the St. Paul and Rock Island Companies and agreed with them upon the terms of the contracts in question. From the memoranda then made by the chief of construction of the Pacific Company the contracts were subsequently drawn. They were examined and approved by the general solicitor of the company at Omaha. The executive committee of the board of directors of the Pacific Company, at a meeting on April 22, 1890, at which six of the seven members of that committee

were present, (five in person and one by proxy,) considered and unanimously voted to approve of the contracts and authorized the president to execute them. The custom of the secretary had been not to specify in the notice of the meetings of the executive committee the subjects to be considered, and the notice of this meeting did not state that the subject-matter of these contracts would be considered. The member of the executive committee who was absent and not represented was a government director.

At the annual meeting of the stockholders of the company held April 30, 1890, at which more than two thirds of the stock was represented, these contracts and the action of the executive committee thereon were considered and resolutions passed by an unanimous vote of that stock, approving and ratifying the contracts and the action of the committee authorizing their execution. The call of the annual meeting did not state that the subject-matter of these contracts would be considered, but that certain other subjects would be, and that the meeting was for the selection of directors for the coming year and the transaction of any other business which might legally come before the meeting. The record of the meeting of the executive committee, April 22, 1890, reads thus:

"The president submitted Vice-President Holcomb's letter No. 1139, dated April 18, 1890, enclosing an agreement between this company and the Chicago, Milwaukee and St. Paul Railway Company, and an agreement between this company, the Omaha and Republican Valley Railway Company, the Salina and Southwestern Railway Company, the Chicago, Rock Island and Pacific Railway Company, and the Chicago, Kansas and Nebraska Railway Company, dated May 1, 1890.

"Whereupon, after consideration, it was,

"On motion of Mr. Spaulding,

"Voted unanimously, that the agreement submitted to the committee between this company and the Chicago, Milwaukee and St. Paul Railway Company, granting trackage rights to the latter company over this company's lines between Council Bluffs, Omaha and South Omaha, for a period of

999 years from May 1, 1890, at a monthly rental of $3750, is approved, subject to the ratification of the stockholders, and the president is hereby authorized to execute the same on behalf of this company;

"Voted, unanimously, that the agreement submitted to the committee, dated May 1, 1890, between this company, the Omaha and Republican Valley Railway Company, the Salina and Southwestern Railway Company, the Chicago, Rock Island and Pacific Railway Company, and the Chicago, Kansas and Nebraska Railway Company, providing for the use of this company's lines from Council Bluffs to Omaha, including the bridge over the Missouri River and the lines of this company's Omaha and Republican Valley branch from Lincoln to Beatrice, Nebraska, and for the use by this company of the Chicago, Kansas and Nebraska Railway Company's lines between McPherson, Kansas, and South Hutchinson, Kansas, for a period of 999 years from May 1, 1890, and for the use of the line between the cities of South Omaha and Lincoln, Nebraska, for a period of 999 years from October 1, 1890, at the rentals severally provided for therein, is approved, subject to the ratification of the stockholders, and the president is hereby authorized to execute the same on behalf of the company."

The following are the resolutions severally adopted by a separate vote, of the entire stock represented, in favor of each :

"*Resolved,* That the agreement between the company and the Chicago, Milwaukee and St. Paul Railway Company, dated May 1, 1890, granting trackage rights to the latter company over this company's lines, between Council Bluffs, Iowa, and Omaha and South Omaha, Nebraska, a copy of which is herewith submitted, be and is hereby approved, and the action of the executive committee in authorizing its execution is hereby ratified, approved and confirmed.

"*Resolved,* That the agreement between the Union Pacific Railway Company, the Omaha and Republican Valley Railway Company, the Salina and Southwestern Railway Company, the Chicago, Rock Island and Pacific Railway

Company, and the Chicago, Kansas and Nebraska Railway Company, dated May 1, 1890, a copy of which is herewith submitted, granting to the latter companies trackage rights ·over this company's lines from Council Bluffs to Omaha, including the Omaha bridge, and the lines of this company's Omaha and Republican Valley branch from Lincoln to Beatrice, Nebraska, and providing further for the use by this ·company of the Chicago, Kansas and Nebraska Railway ·Company's line between McPherson and South Hutchinson, Kansas, and the line from South Omaha to Lincoln, Nebraska, on the terms therein provided for, be and is hereby .approved, and the action of the executive committee in authorizing the execution thereof is hereby ratified, approved .and confirmed."

At this time the whole number of shares was 608,685, and .437,376 shares were voted.

It is not disputed that the board of directors and the body of the stockholders of the other corporations, parties to the ·contracts, took proper action to authorize and ratify the execution thereof by their respective corporations, and that the formal execution of the contracts by the parties to them was .sufficient.

The preamble to the Rock Island contract described the .several railways owned by the parties, and recited that the Rock Island Company had become a domestic corporation of the State of Nebraska, and proposed to· extend its railway from its terminus at Council Bluffs to a connection with its leased line, the Chicago, Kansas and Nebraska Railway, at the city of Beatrice; that the parties to the contract believed that the interests of all would be promoted by using for a part of said extension the main tracks of the Union Pacific Railway Company, in the cities of Council Bluffs and Omaha, the bridge over the Missouri River and that portion of the Omaha and Republican Valley Company, owned by the Union Pacific Company, between Lincoln and the point of junction at the city of Beatrice; by a lease from the Rock Island Company to the Union Pacific Company of a portion of the railroad controlled by it, between McPherson and

Hutchinson, Kansas, a distance of about thirty miles; and a lease of the right of the Union Pacific Company to operate its trains over the road which the Rock Island Company was about to build between the cities of South Omaha and Lincoln.

The contract provided: "The Pacific Company hereby lets the Rock Island Company into the full, equal and joint possession and use of its main and passing tracks, now located and established, or which may be hereafter located and established, between the terminus of such tracks in the city of Council Bluffs, in the State of Iowa, and a line drawn at a right angle across said tracks within one and one half (1½) miles southerly from the present passenger station of South Omaha, in the State of Nebraska, including the bridge on which said tracks extend across the Missouri River, between said cities of Council Bluffs and Omaha; connections with Union Depot tracks in Omaha, the side or spur track leading from its main tracks to the lower grade of the Pacific Company's sidings and spur tracks in Omaha, and such extensions thereof as may be hereafter made; side tracks in Omaha on which to receive from and deliver to the Rock Island Company freight that may be handled through the warehouses, or switched by the Pacific Company; the connections with the Union Stock Yards tracks in South Omaha, and conveniently located grounds in South Omaha, on which the Rock Island Company may construct, maintain and exclusively use a track or tracks, aggregating three thousand (3000) feet in length, for the storage of cars and other purposes, for the term of nine hundred and ninety-nine (999) years, commencing on the first day of May, in the current year; for which possession and use the Rock Island Company covenants, promises and agrees to pay to the order of the said Pacific Company, monthly, during the continuance of said term, the sum of three thousand seven hundred and fifty (3750) dollars," and a certain portion of the expense incurred in maintaining and operating the property between Council Bluffs and South Omaha, and of the assessments and taxes levied thereon in proportion as its wheelage should be to the entire wheelage

over the same ; and also a reasonable compensation for handling its traffic in Omaha; and that the Pacific Company lets the Rock Island Company into the full, joint and equal possession and use of its tracks, stations and appurtenances along the line of the railway of the Republican Valley Company from a point near the northern boundary of the city of Lincoln to the point where its tracks connect with those of the Kansas Company at Beatrice, Nebraska, for the same length of time, for which the Rock Island Company agrees to pay the Pacific Company a certain rental computed on a percentage of the value of the main track, and a proportion of the cost of maintenance; that the Rock Island Company lets the Pacific Company into the full, joint and equal possession and use of its tracks and stations along the lines of the Kansas Company from McPherson to Hutchinson for the same length of time, for a rental to be computed in the same way; that the Rock Island Company lets, leases and demises to the Pacific Company for a like term, commencing October 1, 1890, the right to move and operate over the tracks of the railway it proposes to construct between the cities of South Omaha and Lincoln in the State of Nebraska its freight and passenger trains, engines and cars of all classes for a rental based upon a mileage of the trains; that each of the parties to the contract shall take such steps as will be necessary to continue all the stipulations of the contract in force; that each contract of lease shall attach to that portion of the railway leased during the corporate existence of the owner thereof and all extensions of such existences by renewal or otherwise, and that the contract shall bind the parties thereto, their successors, grantees and assigns ; that "schedules of rules and regulations for the movement of engines and trains over the several railways hereby let and demised shall be made for each railway by the duly authorized officers of the lessor and lessee companies by which such railways shall at the time be operated. Such schedules shall, as nearly as may be practicable, accord equality of right, privilege and advantage to trains of the same class operated by the lessor and lessee, and to trains of a superior class operated by either a preference over trains of an

inferior class operated by the other.   All rules and regulations shall be reasonable and just to both lessor and lessee, and shall secure to neither any preference or discrimination against the other.   They shall be executed and all trains moved under the immediate direction of the superintendent or other officer of the lessor company.   If the parties cannot agree upon the adoption of any schedule, rule or regulation, or as to the modification of any one existing, either party may demand a decision of such controversy by referees as hereinafter provided. The referees are hereby invested with power to prescribe schedules, rules and regulations and to modify existing ones ; and in case of wilful disregard by either party of the rights of the other, to award damages to the party injured for injuries sustained because of such wilful act;" and that the referees shall be appointed when needed by the selection of one by each party, and the appointment of a third by the two so chosen, with further provision for their action in cases of disagreement in other particulars.

It was also agreed that the Pacific Company might admit any other company to the joint use and possession of the same tracks and property upon substantially the same terms, provided such additional burden did not interfere with the Rock Island Company.   Another provision was as follows: "If for any reason any of the covenants, promises and agreements in any of these articles expressed, and not material to the right of the lessee to use the property leased and demised, shall be adjudged void, such adjudication shall not affect the validity or obligation of any other covenant, promise or agreement which is in itself valid.   In the event of a failure in law of any of the covenants, promises and agreements herein contained, such steps shall be taken and contracts made as shall be advised by counsel to carry into effect the purpose and intent herein expressed."

The Rock Island Company was chartered to exist until 1930, but the charter provided that its existence might " be renewed from time to time as may be provided by the laws of the States of Illinois and Iowa."

The Rock Island Company, upon the construction of its pro-

posed line from South Omaha to Lincoln, obtained by the agreement access to Omaha and South Omaha, and a shorter continuous line from Chicago to Denver by way of Council Bluffs, Lincoln and Beatrice than by its southerly route; while by the use of the proposed road from South Omaha to Lincoln the Pacific Company obtained a line from Omaha to Lincoln and Beatrice, about forty miles shorter than its former route by way of Valley Station; and, by its use of the road from McPherson to Hutchinson, it filled the gap between its line there and obtained a continuous line by way of Salina to the southern boundary of Kansas; and a rental of $45,000 a year, and other compensation as provided.

The contract with the St. Paul Company let it into the joint and equal use of the tracks and bridge between Council Bluffs and South Omaha for the same time and on the same terms named in the contract with the Rock Island Company. The main tracks of the Pacific Company to be used under this contract were two, extending a distance of about seven miles from Council Bluffs across the bridge and through the city of Omaha to South Omaha.

On the seventeenth of May the superintendent of the Pacific Company addressed a letter to the superintendent of the Rock Island Company, requesting the construction of the connecting track which would enable it to use the Kansas Railway between McPherson and Hutchinson. The Rock Island immediately constructed the track, and the Pacific Company at once began to use it, and continued to use it until January 12, 1891.

The Rock Island proceeded with the construction of its road from South Omaha to a connection with the tracks of the Republican Valley in Lincoln, and secured depots and yards in Omaha and South Omaha, and made an arrangement with the Pacific Company for the construction of freight and passenger stations and a yard on the ground of the Republican Valley road in Lincoln to be used by the Rock Island and Pacific companies jointly. Prior to December 1, 1890, it had expended in such construction between South Omaha and Lincoln over $1,400,000. All this was done in reliance upon the contract, and the railway and buildings erected could be used

for the principal purpose for which they had been constructed only in connection with the tracks of the Union Pacific at and between Council Bluffs and South Omaha and at and between Lincoln and Beatrice. The work at Lincoln had commenced on December 1, when the Pacific Company notified the Missouri and Burlington Company, whose depot it had theretofore been using, that after December 31 it would abandon such use. This notice was given with the intention of entering into the joint use of the Rock Island depots and tracks.

About June 1, 1890, the St. Paul Company entered upon the use and possession of the bridge and the tracks between the points named in its contracts.

November 26, 1890, a change of management in the Union Pacific took place and opposition to the contracts developed. Early in January, 1891, the Pacific Company forcibly prevented the use by the Rock Island and St. Paul companies of its tracks at Omaha which they were entitled to use under the contracts and absolutely refused to perform the contracts. Thereupon these suits were commenced, one by the Rock Island Company against the Pacific Company and the Republican Valley Company, and the other by the St. Paul Company against the Pacific Company. The Pacific Company set up by way of defence that the use of this road as claimed would deprive it of the means granted to it under the act of Congress to earn moneys with which to maintain its corporate existence, perform the duties of a common carrier and meet the demands of the government; that the officers of the Pacific Company were not so authorized to execute the contracts as to make it competent for them to do so and that they were not so entered into as to bind the company to the performance thereof; that the contracts were unjust and inequitable, and were improvidently made, and ought not to be sanctioned and enforced by a court of equity; that the government directors of the Pacific Company did not authorize or sanction the contracts; that the contracts were *ultra vires*, and that that company did not have any right, power or authority to enter into them; and that the contracts were not such as a court of equity could or should specifically enforce.

In the *Rock Island case*, the Circuit Court decreed that the contract was "the valid obligation of the parties thereto, and should be performed in good faith by each of them;" that it secured the several rights embraced thereby, all of which were specifically set forth, subject to the following limitations :

"1. That the engines, cars and trains of complainant shall be moved on said tracks under rules and regulations to be agreed upon by and between the parties, or ordained by referees selected and appointed in the manner provided by said contract, and securing equality of right, privilege and advantage to trains of the same class operated by both parties, and to trains of a superior class operated by either a preference over trains of an inferior class operated by the other ; which rules and regulations shall be executed and all engines, cars and trains moved under the immediate direction of the superintendent or other officers of the defendant, the Union Pacific Railway Company.

"2. That the Union Pacific Railway Company may admit any other company or companies operating a connecting railway or railways to the joint possession and use of the railway, or any part thereof, at and between Council Bluffs and South Omaha, upon substantially the same terms as those granted to the complainant ; and apply the compensation which it may receive from such additional company or companies to its own use, without accounting for the same or any part thereof to the complainant.

"3. The complainant shall not do any business as a common carrier of persons or property to or from any stations on said line between said cities of Lincoln and Beatrice.

"4. That complainant shall make compensation for such possession and use as provided by said contract."

The decree then continued :

"III. That the defendants, the Union Pacific Railway Company and the Omaha and Republican Valley Railway Company, are commanded severally to specifically perform, keep and observe the several covenants, promises and agreements in said contract set out, to be by them, either jointly or severally observed, kept or performed ; and that said rail-

way companies and the officers, agents, attorneys and employés of each are hereby commanded and enjoined to wholly refrain from directly or indirectly interposing any obstacle, interference, hindrance or delay to the performance of the several promises, covenants and agreements in said contract set out, or to the enjoyment of any of the rights or privileges by said contract granted, concerning the railway and railway property above described, by any and all of the parties to said contract, or by any of the officers, agents, attorneys or employés of said parties, or any of them ; and especially from in any manner obstructing or interfering with said complainant in restoring and maintaining the connections which have heretofore been constructed, or in constructing and maintaining at such point or points, as may be determined under the contract, additional necessary connections between the railways of the Chicago, Kansas and Nebraska Railway Company and the Omaha and Republican Valley Railway Company at Beatrice, and between the railway of complainant and that of the Omaha and Republican Valley Railway Company at Lincoln, in the State of Nebraska, and between the railway of complainant and the railway of said Union Pacific Railway Company, at South Omaha and Omaha, in the State of Nebraska, and the city of Council Bluffs, in the State of Iowa; and from doing any act or thing, or permitting the doing of any act or thing, if it shall have power to prevent the same, whereby said complainant may be prevented from enjoying any and all of the benefits and advantages secured to it by said contract, or doing any act or thing which the complainant by the terms of said contract is authorized to do; from interfering with the use of, and from removing, injuring or destroying buildings or other structures erected by the complainant upon the grounds of the defendant, the Omaha and Republican Valley Railway Company, in the city of Lincoln, in the State of Nebraska, without the consent of said complainant.

"IV. That each and every party hereto is commanded to refrain from interposing any obstacle or hindrance to the establishment, or alteration, or amendment in the manner provided

by said contract, of time cards, rules and regulations governing the operations of engines, cars and trains over said railways and every part thereof; or to the execution and enforcement of such time cards, rules and regulations when so established, altered or amended, otherwise than by apt proceedings in a court having competent jurisdiction.

"V. That nothing in this decree contained shall operate to estop any party hereto from recovering against another party or parties, by appropriate proceedings in law or equity, the compensation to which it is now or may be hereafter entitled, for the use of any of the railway and appurtenant property between and at Council Bluffs and South Omaha, between and at South Omaha and Lincoln, between and at Lincoln and Beatrice, and between McPherson and South Hutchinson, or from recovering in such proceedings damages which it has sustained, or may sustain, because of any breach or violation of said contract.

"VI. That while this decree is final in determining the rights of the parties under said contract, the court reserves the power to make additional orders from time to time, as may be necessary to enforce such rights."

The decree in favor of the St. Paul Company was to the same effect, *mutatis mutandis*.

*Mr. John F. Dillon* and *Mr. John M. Thurston* for appellants. *Mr. Harry Hubbard* was on their brief.

*Mr. J. M. Woolworth* for Chicago, Rock Island and Pacific Railway Company. *Mr. M. A. Low* and *Mr. R. Mather* were on his brief.

*Mr. George R. Peck* for Chicago, Milwaukee and St. Paul Railway Company. *Mr. Burton Hanson* was on his brief.

MR. CHIEF JUSTICE FULLER, after stating the case, delivered the opinion of the court.

The questions to be considered are whether these contracts are within the corporate powers of the parties; were duly

authorized as respects the Union Pacific Railway Company; were such contracts as a court of equity can specifically enforce; and were properly enforced on the merits.

It will be most convenient to consider the appeal in the case of the Rock Island Company. If the decree in favor of that company is affirmed, a like result must follow on the appeal in the case of the St. Paul Company. And we may remark in the outset that the main contention of the Pacific Company concerns the tracks between Council Bluffs and South Omaha, including the bridge.

1. Railroad corporations possess the powers which are expressly conferred by their charters, together with such powers as are fairly incidental thereto; and they cannot, except with the consent of the State, disable themselves from the discharge of the functions, duties and obligations which they have assumed. Can it be held that the contract with the Rock Island Company, judged by its terms, construed in the light of matters of common knowledge, of the evidence and of applicable legislation, was made in the assumption of powers not granted, or amounted to the surrender of powers that were?

The general rule is that a contract by which a railroad company renders itself incapable of performing its duties to the public or attempts to absolve itself from those obligations without the consent of the State, or a contract made by a corporation beyond the scope of its powers, express or implied, on a proper construction of its charter, cannot be enforced, or rendered enforceable by the application of the doctrine of estoppel. *Thomas* v. *Railroad Co.*, 101 U. S. 71; *Central Transportation Co.* v. *Pullman Car Co.*, 139 U. S. 24.

But where the subject-matter of the contract is not foreign to the purposes for which the corporation is created, a contract embracing " whatever may fairly be regarded as incidental to, or consequential upon, those things which the legislature has authorized, ought not, unless expressly prohibited, to be held by judicial construction to be *ultra vires*." *Jacksonville Railway Co.* v. *Hooper*, 160 U. S. 514, 525; *Attorney*

*General* v. *Great Eastern Railway*, 5 App. Cas. 473, 478; *Brown* v. *Winnisimmet Company*, 11 Allen, 326, 334.

Taking up the contract with the Rock Island Company, what is the nature of the undertaking of the Pacific Company? In several places in this instrument it is called a "lease" and the parties are called "lessor" and "lessee;" while, on the other hand, in the record of the proceedings of the executive committee of the Pacific Company and of its stockholders, it is called an agreement "granting trackage rights" between Council Bluffs and South Omaha. But what it was styled by the parties does not determine its character or their legal relations, and in its interpretation the rule applies that "the court is not only at liberty, but required, to examine the entire contract, and may also consider the relations of the parties, their connection with the subject-matter of the contract, and the circumstances under which it was signed." *Rock Island Railway Co.* v. *Rio Grande Railway Co.*, 143 U. S. 596, 609.

In *Thomas* v. *Railroad Company*, 101 U. S. 71, 79, Mr. Justice Miller stated the real question to be "whether the railroad company exceeded its powers in making the contract, by whatever name it may be called, so that it is void."

And Mr. Justice Brewer, in his opinion on circuit, observed: "Neither the form of expression on the one hand, nor the name on the other, is conclusive. We must see what rights and privileges were in fact granted, what burdens and obligations assumed."

The contract provided that the Pacific Company hereby "lets the Rock Island Company into the full, equal and joint possession and use of its main and passing tracks." The possession here spoken of was such possession as the Rock Island Company would have when its engines, cars and trains were running over the tracks. The company had no possession before its trains came on the tracks or after they had run off of them, and while its trains were on the tracks its possession was only of the particular part occupied temporarily while running over them. Moreover, all trains were to be moved under the direction of an officer of the Pacific Company.

The Rock Island trains coming upon a Pacific track immediately passed from the control of the Rock Island Company into that of the Pacific, and its officials were subjected to the orders of the Pacific's officers. And throughout the whole contract there does not appear to be a single provision which looks to any actual possession by the Rock Island of any of the Pacific property beyond that which was involved in its trains being run over the tracks under the direction of the other company. The contract in this regard was really an agreement for trackage rights, for running arrangements, a " terminal contract " with compensation on a " mileage " or " wheelage basis," rather than a lease.

The Pacific Company in its answer said that it had offered and now offered " to accept and transport all the cars and trains of the complainant, freight and passenger, to and from all points on the line of the said defendant described in said supposed contract, and thereby enable the complainant to maintain its business at Omaha and South Omaha, and to carry on exactly the same business that it could have carried on by the operation of its own trains, by its own engines and by its own employés, as provided for in said supposed contract; and it says that it has offered, in the utmost good faith, to perform this service immediately and at all times, for the said complainant, at a reasonable compensation, to be fixed in any fair, usual and ordinary manner." It thus appears that the Pacific Company could do what it had contracted to do, and that the contention resolves itself into the proposition that there is a fundamental legal difference between authorizing the Rock Island to haul its trains with its own engines, and agreeing to haul them with the Pacific Company's engines, though in either event they were to be moved under the train dispatchers of the Pacific Company — a difference we find ourselves unable to admit.

In *Chicago, Rock Island & Pacific Co.* v. *Denver & Rio Grande Co.*, 143 U. S. 596, 618, the Rio Grande Company had granted to the Rock Island Company the use of its terminal facilities at Denver, and it insisted that it could more conveniently handle the Rock Island trains with its own

engines and crews than with those of the Rock Island. But this court, speaking through Mr. Justice Brown, said: "It is obviously necessary to the harmonious working of the two systems that the general control and management of the yard should remain with the defendant; but it is not easy to see why that control may not be as well exercised over two switching crews belonging to two different companies as over two crews belonging to the same company. . . . It occurs to us that it would cause fully as much inconvenience to transfer the control of trains from the employés of one company to those of another, as such trains enter or leave the terminal yard, as it would be to permit the switching of such trains within the yard by the hands that brought them in or were to take them out. It appears that yards have been jointly operated in this manner in such large railway centres as Kansas City, Toledo and Chicago without serious difficulty. We think that the same rule should also be applied to those employed in handling the freight. With reference to this, the decree of the court below provided that the plaintiff had a right to employ its separate switching crews and operate its own switching engines in the yards of the defendant company under the sole and absolute supervision, direction and control, however, of the yardmaster or other properly constituted officer or agent of the defendant, and subject to the orders and instructions of such yardmaster, etc., and in this there was no error."

Such being the nature of the contract, a contract frequently made between railroad companies, upon what reasonable ground should it be held invalid as an unlawful assumption of power?

The evidence shows that between the bridge and South Omaha some of the most thickly populated and densely settled portions of the city of Omaha are situated; that five railroads engaged in transcontinental traffic do their terminal business there, taking up and setting down passengers, collecting, unloading and delivering freight; that a large part of the territory is filled with the tracks of the Union Pacific and Burlington Companies, and that there is scant room, if

any, for another company with the many tracks required for terminal business; that the whole territory is very valuable, densely populated and filled with tracks; and that at South Omaha are stockyards and packing industries of great extent, furnishing the companies a vast volume of freight and compelling the building of many tracks. If it were true that railroad companies could not, ordinarily, without the aid of a statute, grant running facilities over their tracks even when such an arrangement would not interfere with their business, the application of so rigorous a rule to defeat a contract as between the parties, in respect of tracks in the congested parts of large cities, where the entire use of them is not required by their owners, does not seem reasonable. It is well said by Sanborn, J., speaking for the Circuit Court of Appeals: "Courts cannot be blind to the fact that every railroad company cannot have entrance to our great cities over tracks of its own, or to the fact that railroad companies do, and every public interest requires that they should, make proper contracts for terminal facilities over the roads of each other."

We think that it would be carrying the doctrine of *ultra vires* much too far to deny absolutely the competency of a railroad company, being a public highway, whose use is common to all citizens, to contract to give another running rights over its tracks without express statutory authority; and that, under proper circumstances, such a contract may well be held within its implied powers.

In *Lake Superior Railway Co.* v. *United States,* 93 U. S. 492, Mr. Justice Bradley adverts to and comments on the fact that in England and in this country railroads when first constructed were by the legislatures and the people regarded and treated as public highways for the use of all who had occasion to run their vehicles thereon; and this is certainly so far true, in modern acceptation, that being for the common use of the public, their owners are ordinarily competent to make contracts which will subserve such use.

But the determination of the existence of the power to grant running rights in this instance does not rest on these

considerations alone. For the provisions of the Pacific Railroad acts relating to the bridge over the Missouri River, its construction and operation, imposed on the Pacific Company the duty of permitting the Rock Island Company to run its engines, cars and trains over the bridge and the tracks between Council Bluffs and Omaha, and we think that South Omaha was included.

The original charter of 1862 required the construction of the Pacific road from the east bank of the river, and so impliedly authorized the company to bridge it, and the amendatory act of 1864 expressly gave the corporation authority "to construct bridges over said Missouri River." The bridge contemplated was for the company's use as a part of its road, and no provision was made for other roads or other business, nor were any special means provided for the construction of the bridge.

In 1871 several roads had been built from the East to Council Bluffs, and others were building and roads were in process of construction in Nebraska with Omaha as their terminus.

The Omaha Bridge act of February 24, 1871, c. 67, 16 Stat. 430, was then passed, by which, "for the more perfect connection of any railroads that are or shall be constructed to the Missouri River, at or near Council Bluffs, Iowa, and Omaha, Nebraska," the company was authorized to issue bonds not exceeding two and one half million dollars, and to "secure the same by mortgage on the bridge and approaches and appurtenances, as it may deem needful to construct and maintain its bridge over said river, and the tracks and depots required to perfect the same, as now authorized by law of Congress." The bridge was "to be so constructed as to provide for ordinary vehicles and travel;" and the company was authorized "to levy and collect tolls for the use of the same." The act further provided "for the use and protection of said bridge and property, the Union Pacific Railway Company shall be empowered, governed and limited by the provisions of the act entitled 'An act to authorize the construction of certain bridges and to establish them as post roads,' approved July twenty-five, eighteen hundred and sixty-six, so far as the same

is applicable thereto." The act of 1866 thus referred to, 14 Stat. 244, c. 246, is entitled "An act to authorize the construction of certain bridges and to establish them as post roads." It authorized the construction of nine different bridges, eight across the Mississippi River and one across the Missouri River. The first bridge provided for was to be constructed at Quincy, Illinois, and by the first section it was made lawful for any person or persons, company or corporation, having authority from the States of Illinois and Missouri for that purpose, "to build a bridge across the Mississippi River at Quincy, Illinois, and to lay on and over said bridge railway tracks, for the more perfect connection with any railroads that are or shall be constructed to the said river at or opposite said point, and that when constructed the trains of all roads terminating at said river, at or opposite said point, shall be allowed to cross said bridge for reasonable compensation, to be made to the owners of said bridge under the limitations and conditions hereinafter provided."

The common object of both these acts plainly was the more perfect connection of roads running to the bridges on either side of the river. And this is in harmony with numerous acts of Congress referred to in the opinion of the Circuit Court of Appeals; Act of February 21, 1868, 15 Stat. 37; Act of May 6, 1870, c. 93, 16 Stat. 121; Act of June 30, 1870, c. 176, 16 Stat. 173; Act of July 1, 1870, c. 195, 16 Stat. 185; Act of March 3, 1871, c. 110, 16 Stat. 473; Joint resolution of March 3, 1871, No. 48, 16 Stat. 599, and many others, all of them indicating a settled policy that all structures of this character should allow connecting roads to cross them with their cars, trains and engines. It is said that the reference to the act of 1866 should be confined to its second and third sections; but as the matters provided for in those sections were fully otherwise covered in the Pacific Railroad acts, that does not commend itself to us as a reasonable construction. But it is argued that even if the Pacific Company were authorized to grant to the Rock Island Company the right to run its trains with its engines over the bridge, it was not empowered to grant the same rights over the tracks. The evidence shows

that the tracks east of the bridge were upon the approach to the structure proper, and it appears from the maps that the depot at the west end of the bridge was more than half a mile distant. The act of 1871 provided that for the more perfect connection of the roads east of the river with those west of it the company might issue bonds and secure the same by mortgage " on the bridge and approaches and appurtenances," and it would seem to be clear that the approaches on the west side, as well as on the east, must be regarded as part of the structure. Moreover, the act refers to " the tracks and depots required to perfect the same." A railroad bridge can be of no use to the public unless united with necessary appurtenances, such as approaches, tracks, depots and other facilities for the public accommodation. And we consider Council Bluffs, Omaha and South Omaha, under the facts, as necessarily embraced in the intention of Congress. It is true that it appears that from the depot to the point in South Omaha where the tracks of the companies connected, is about four miles; but the scheme of Congress was to accomplish the more perfect connection " at or near Council Bluffs, Iowa, and Omaha, Nebraska," and we think this distance reasonably within the terms of the act of 1871, liberally construed, as the act should be.

The legislation of 1862 and 1864 in respect of the Union Pacific Railway Company was under consideration in *Union Pacific Railway Co.* v. *Hall*, 91 U. S. 343, 345, and it was said by Mr. Justice Strong: "The scheme of the act of Congress, then, is very apparent. It was to secure the connection of the main line, by at least three branches, with the Missouri and Iowa railroads, and with a railroad running eastwardly from Sioux City in Iowa, either through that State or through Minnesota. An observance of this scheme, we think, will aid in considering the inquiry at what place the act of Congress, and the orders of the President made in pursuance thereof, established the eastern terminus of the Iowa branch. From it may reasonably be inferred that the purpose of Congress was to provide for connections of the branches of the main line of the Union Pacific road with railroads running through the States on the east of the Territory, and to provide for those connec-

tions within those States at points at or near their western boundaries."

On June 15, 1866, an act was approved, c. 124, 14 Stat. 66, "to facilitate commercial, postal and military communication among the several States," carried forward as section 5258 of the Revised Statutes, which provided that "every railroad company in the United States, whose road is operated by steam, its successors and assigns, be, and is hereby, authorized to carry upon and over its road, boats, bridges and ferries, all passengers, troops, government supplies, mails, freights and property on their way from any State to another State, and to receive compensation therefor, and to connect with roads of other States so as to form continuous lines for the transportation of the same to the place of destination."

It is impossible for us to ignore the great policy in favor of continuous lines thus declared by Congress, and that it is in effectuation of that policy that such business arrangements as will make such connections effective are made.

We are of opinion that it was within the powers of the Pacific Company to enter into contracts for running arrangements, including the use of its tracks, and the connections and accommodations provided for, and we cannot perceive that this particular contract was open to the objection that it disabled the Pacific Company from discharging its duties to the public. By the contract the Pacific Company parted with no franchise, and was not excluded from any part of its property or the full enjoyment of it. What it agreed to do was to let the Rock Island into such use of the bridge and tracks as it did not need for its own purposes. This did not alien any property or right necessary to the discharge of its public obligations and duties, but simply widened the extent of the use of its property for the same purposes for which that property was acquired, to its own profit so far as that use was concerned, and in the furtherance of the demands of a wise public policy. If, by so doing, it may have assisted a competitor, it does not lie in its mouth to urge that as rendering its contract illegal as opposed to public policy. Ability to perform its own immediate duties to the public is the limitation on its *jus*

*disponendi* we are considering, and that limitation had no application to such a use as that in question.

The leading cases of *Thomas* v. *Railroad Co.*, 101 U. S. 71; *Pennsylvania Railroad Co.* v. *St. Louis, Alton &c. Railroad*, 118 U. S. 290; *Oregon Railway Co.* v. *Oregonian Railway Co.*, 130 U. S. 1; *Central Transportation Co.* v. *Pullman Car Co.*, 139 U. S. 24; *St. Louis &c. Railroad Co.* v. *Terre Haute &c. Railroad Co.*, 145 U. S. 393; *United States* v. *Union Pacific Railway Co.*, 160 U. S. 1, arose upon instruments which dispossessed the corporations of all their property and of all capacity to perform their public duties. But we have no such case here.

The argument is pressed that the Pacific Company might become disabled by reason of the increase of business in the future, but the defendant asserts in its answer that it is able to carry on the business of hauling complainant's cars "immediately and at all times," if it may do so with its own engines and on its own terms, and be permitted in the meantime to repudiate this contract. The proof wholly fails to establish that the contract involves any present inability or any existing ground for apprehension in that regard, and shows that the bridge and tracks of the Pacific Company are fully adequate to meet much larger demands than are now, or within any reasonable time can be expected to be, made upon them under the contract. The country, as was said below, will grow in population and business, and the business of this particular corporation will increase, but with the increased volume of business come increased facilities for its transaction. Moreover, increase in the same ratio for the future as in the past is not to be expected, for new roads are constantly being built and other channels of transportation opened; and it cannot be conclusively assumed that the common means of transportation twenty years hence may not be quite different from what they are at present. It will not do to hold this contract void and allow defendant to escape from the obligations it assumed on the mere suggestion that at some time in the remote future there is a possibility that the suggested contingency might arise. Should it happen, however, the courts are competent

to relieve from the consequences of so radical a change of condition.

Objection is made that by reason of the provision for referees in case of difference between the two companies as to the operation of trains, the full control of the Pacific Company of its road and franchises is taken away. If that stipulation were stricken out, the right of the Rock Island Company to use the tracks, subject to the reasonable management of the Pacific Company's officers, would still remain, and the contract itself contained a provision contemplating the possible invalidity of some one of the stipulations not of the essence of the contract. There does not appear to have been any specific contention in the Circuit Court or in the Court of Appeals that that particular clause was invalid; and, if it were, the power reserved in the decree was sufficient to permit an application to the court for its modification and the substitution of the judgment of the court. We cannot hold that if the particular clause were objectionable the contract would be invalidated as a whole, and it is too late to ask a reversal on the ground that the clause itself is not enforceable.

We do not feel called upon to enter at length upon other objections urged by appellants' counsel. One of them was that the Rock Island and St. Paul companies derived no power from the laws of Nebraska to enter into the alleged contract because they had not complied with the statutes of the State in that behalf. After the testimony was closed, and as the final hearing commenced, defendants moved the court to permit the introduction of the evidence upon which this contention is based. This was objected to by complainants, the objection sustained and defendants excepted. We concur in the view of the Circuit Court of Appeals, which held that there was no abuse of discretion in the court below in denying the motion, and did not consider the rejected evidence or the argument based upon it. The Rock Island Company built its road from South Omaha to Lincoln as vested with the corporate power to do so, and it contracted as in the possession of the power as a corporation existing in

and under the laws of Nebraska. The State appears to have been content, and the contract, not being necessarily beyond the scope of the powers of the corporation, must, in the absence of proof to the contrary, be deemed valid.

Nor can the contract be held invalid because within its prescribed duration the charter of the Rock Island Company expired by its terms. The contract was carefully drawn in view of such expiration of the several corporate existences of the parties to it, who bound themselves to take such steps as might be necessary to continue the contract in force. And, as observed by the Court of Appeals, the contingency that the Rock Island Company "will cease to exist and leave neither assigns nor successors is far too remote to have any influence upon the validity of this contract." 10 U. S. App. 192.

It is also said that the contract was void so far as the Republican Valley Railroad Company was concerned, because without consideration, inasmuch as the Rock Island Company was to pay the Pacific Company for the possession and use of the railway and appurtenant property between Lincoln and Beatrice to the Pacific Company, and so the Valley Company, as an independent corporation, received no compensation; but the stockholders of the Valley Company entered into the covenants in question, and as each of its incorporators was an officer or employé of the Union Pacific Company; its road was built with the funds of that company; every share of its stock ever issued was taken, held or voted by some officer or employé of that company in trust for it; the officers of the two companies had always been the same, and in their operation no distinction had ever been made between the two roads; and their earnings had gone into and their expenditures been paid from a common treasury, we think there is no merit in the objection that for the reason given the Valley Company was not bound by its covenants.

But it is earnestly contended that the Pacific Company had no power under its charter as a Federal corporation to operate any other line of road than those lines which it was specifically authorized by Congress to construct, and that it was prohibited under the constitution and laws of Nebraska from

doing so, and therefore that it could not obligate itself to use, and to pay to the Rock Island Company compensation for the use of, the road between South Omaha and Lincoln.

It does not appear that this point was called to the attention of the Circuit Court or decided by it, nor in the errors assigned to the decree of the Circuit Court in the Circuit Court of Appeals was there any error attributed to the decree in this particular; nor did that court pass upon any such question. It is indeed admitted that the point is raised for the first time in this court. We have to determine on this appeal whether in our judgment the Circuit Court of Appeals did or did not err, and affirm or reverse accordingly. It is true that our decision necessarily reviews the decree of the Circuit Court in reviewing the action of the Court of Appeals upon it, and, under the statute, our mandate goes to the Circuit Court directly, but it is, notwithstanding, the judgment of the Circuit Court of Appeals that we are called on primarily to revise. It will be seen then that the judgments of the Courts of Appeals should not ordinarily be reëxamined on the suggestion of error in that court in that it did not hold action of the Circuit Court erroneous which was not complained of. We will, however, make a few observations on the point thus tardily presented.

The eighth section of the eleventh article of the constitution of that State provided that no railroad corporation of any other State or of the United States, doing business in Nebraska, should be entitled to exercise the right of eminent domain or have power to acquire right of way or real estate for depot or other uses until it should have become a corporation of the State pursuant to the constitution, but we do not see what that provision has to do with this question. The stipulations of the contract relating to the use of the Rock Island tracks between South Omaha and Lincoln by the Pacific Company did not embrace the acquisition of right of way or real estate, or the exercise of the power of eminent domain by the latter.

By the contract the Rock Island Company gave the Pacific Company "the right and privilege to move and operate its

trains over the tracks" and nothing more, and it was provided that the Pacific Company should do no business at intermediate points. The Pacific Company was to run its trains over the Rock Island tracks forty-five miles, and it agreed to pay a fair compensation for doing so. It was perfectly competent for the Pacific Company to contract to deliver at Lincoln freight and passengers taken up at Omaha, and in carrying out such contract it could make deliveries in carloads just as well as in small parcels. It follows that its cars might be run through, and the fact that under this contract the Pacific Company would haul its cars with its own engines amounts to no more than a mere method of doing the business. And as, when it contracts for deliveries beyond its own line, it must pay the connecting company for its services, that compensation might be fixed by the parties upon any basis they agreed to. Here it agreed to pay a certain sum per mile for the mileage over which its trains run, and the difference between that and any other mode of payment did not go to the powers of the company. Where a corporate contract is forbidden by a statute or is obviously hostile to the public advantage or convenience, the courts disapprove of it, but when there is no express prohibition and it is obvious that the contract is one of advantage to the public, the rule is otherwise. As remarked in *Jacksonville Railway Co.* v. *Hooper*, 160 U. S. 514: "Although the contract powers of railroad companies are to be restricted to the general purposes for which they are designed, yet there are many transactions which are incidental or auxiliary to its main business, or which may be useful in the care and management of the property which it is authorized to hold, and in the safety and comfort of the passengers which it is its duty to transport. Courts may be permitted, where there is no legislative prohibition shown, to put a favorable construction upon such exercise of power by railroad companies as is necessary to promote the success of the company within the powers of its charter and to contribute to the comfort of those who travel thereon." And that principle is applicable to the transportation of through freight and passengers over connecting lines.

Under the laws of Nebraska railroad companies are clothed with ample power to make leases or any arrangements for their common benefit consistent with and calculated to promote the objects for which they are created. Comp. Stat. Neb. 1889, 248, c. 16, § 94. There is nothing in the charter of the Pacific Company that prohibits such an arrangement as this in controversy, unless by implication, and as by it the public interest was subserved, that company reached its own lines by a shorter route and accommodated its own through freight and travel, we are not prepared to hold that it was invalid.

These observations also apply to the clause of the contract in respect of the road between McPherson and Hutchinson, but it should be added that that reach of road was held and operated by the Kansas Company, which was a Kansas corporation. The Union Pacific Railway Company was formed by the consolidation of the Union Pacific Railway Company, a Federal corporation, the Denver Company, a Colorado corporation, and a corporation originally named the Leavenworth, Pawnee and Western Railway, afterwards called the Union Pacific Railway, Eastern Division, and lastly the Kansas Pacific Railway. The latter company by its first name was incorporated under the laws of the Territory of Kansas, and upon the admission of Kansas into the Union became a corporation of that State. The acts of Congress of 1862 and 1864 clothed it with new franchises, but did not deprive it of its powers as a State corporation, which could be exercised by the consolidated company in Kansas, so far as not in derogation of its Federal powers. And Kansas corporations were duly empowered to enter into leases and the like by the state laws. Gen. Stat. Kansas, c. 23, § 112, vol. 1, 443.

2. Was the contract, if within its powers, duly authorized by the Pacific Company? No question arises but that the contract was executed in due form, and, as to the manner in which its execution was authorized, the facts appear to be: On April 22, 1890, the executive committee passed the resolution approving the contract and authorizing the president of the company to execute it, and on the thirtieth of the same

month the stockholders at their regular annual meeting voted
to approve the contract and the action of the executive com-
mittee relative thereto.  The board of directors never for-
mally acted.  As soon as the contract was executed, the Pacific
Company required the Rock Island Company to make proper
connections between McPherson and Hutchinson, which was
done, and the Pacific Company commenced to run over those
tracks, and continued to do so until after the disputes between
the two companies became flagrant.  On the other hand, the
Rock Island Company commenced the construction of its road
between South Omaha and Lincoln and of the stations and
yards at Lincoln on the lands of the Republican Valley
Company.  Appellants contend that the action of the stock-
holders and the executive committee was ineffectual because
the board of directors was the only body that could authorize
the president and secretary to make the contract.  The con-
tract appearing on its face to have been duly executed, and
the parties having entered upon its execution, necessarily with
full knowledge on the part of the board of directors of the
Pacific Company, the board would be presumed to have rati-
fied it, although it in fact took no affirmative action in the
matter.  *Pittsburgh &c. Railway Co.* v. *Keokuk Bridge Co.,*
131 U. S. 371, 381.

When by the charter of a corporation its powers are vested
in its stockholders, and this was the common law rule when
the charter was silent, the ultimate determination of the
management of the corporate affairs rests with its stock-
holders, and the charter of the Pacific Company did not com-
mit the exclusive control to the board of directors.

By the first section of the act certain persons named,
together with five commissioners to be appointed by the Sec-
retary of the Interior, were with their successors created a
body corporate and politic with certain powers, which were
to determine after the company was fully organized, "and
thereafter the stockholders shall constitute said body politic
and corporate."  It was further provided: "Said company, at
any regular meeting of the stockholders called for that pur-
pose, shall have power to make by-laws, rules and regulations

as they shall deem needful and proper, touching the disposition of the stock, property, estate and effects of the company not inconsistent herewith, the transfer of shares, the terms of office, duties and conduct of their officers and servants, and all matters whatsoever which may appertain to the affairs of said company." The same section provided that the directors "shall have power to appoint such engineers, agents and subordinates as may from time to time be necessary to carry into effect the object of this act, and to do all acts and things touching the location and construction of said road and telegraph. Said directors may require payment of subscriptions to the capital stock after due notice, at such times and in such proportions as they may deem necessary to complete the road and telegraph within the time in this act prescribed."

Acting under the authority conferred upon them by the charter, the stockholders of the Pacific Company adopted by-laws for the government of the corporation and for the regulation of its business affairs. By section two of article four of the by-laws it was provided: "The board of directors shall have the whole charge and management of the property and effects of the company and they may delegate power to the executive committee to do any and all of the acts which the board is authorized to do except such acts as by law and these by-laws must be done by the board itself." Thus the stockholders authorized the board of directors to delegate the power to the executive committee to do any and all acts which the board itself was authorized to do. The executive committee derived its authority from the stockholders through the board of directors. By section two of article five of the by-laws it was provided: "The executive committee shall have, and may exercise by a majority of its members, all the powers and authority which from time to time may be delegated to said committee by the board of directors." As early as March 15, 1877, the board of directors adopted a resolution, "that while the board of directors is not in session the full power thereof, under the charter and by-laws, is hereby conferred upon the executive committee, and the proceedings of said committee at its last meeting are hereby ratified and con-

firmed." In 1879 the form of resolution adopted by the board was as follows: "Resolved, that while the board of directors is not in session, the full power under the charter and by-laws be, and it is hereby, conferred upon the executive committee." Similar resolutions were passed every year up to April 30, 1890, when the board of directors passed substantially the same resolution which they had been in the habit of adopting from year to year. It was shown that the meetings of the executive committee were frequent, but that the board usually met only twice a year, the business of the company being more conveniently transacted by the committee.

The contracts in question were in the proper form, signed and executed by the proper executive officers and attested by the corporate seal; they were approved and authorized by the executive committee, which committee had all the powers of the board, and were ratified, approved and confirmed by the stockholders at their regular annual meeting. This was sufficient to bind the Pacific Company although no formal action by the board was had. But it is argued that this cannot be so because of the peculiar relation which the government directors of the Pacific Company bore to the corporation, differing from that of other directors; and the absence of the government director, who was a member of the executive committee, from the meeting which approved and authorized the contracts, is also commented on as if thereby the action of the executive committee in that behalf was rendered ineffective.

By the first section of the act of 1862 not less than thirteen directors were to be elected and two to be appointed by the President of the United States, "who shall act with the body of directors, and be denominated directors on the part of the government."

The thirteenth section of the act of 1864 is as follows:

"That at and after the next election of directors, the number of directors to be elected by the stockholders shall be fifteen; and the number of directors to be appointed by the President shall be five; and the President shall appoint three additional directors to serve until the next regular election, and there-

after five directors. At least one of said government directors shall be placed on each of the standing committees of said company, and at least one on every special committee that may be appointed. The government directors shall, from time to time, report to the Secretary of the Interior, in answer to any inquiries he may make of them, touching the condition, management and progress of the work, and shall communicate to the Secretary of the Interior at any time such information as should be in the possession of the department. They shall, as often as may be necessary to a full knowledge of the condition and management of the line, visit all portions of the line of road, whether built or surveyed; and while absent from home, attending to their duties as directors, shall be paid their actual travelling expenses, and be allowed and paid such reasonable compensation for their time actually employed as the board of directors may decide."

We see nothing in the provisions relating to government directors which makes it indispensable that the board should formally authorize such contracts as the one under consideration. Congress did not vest in the government directors any peculiar powers. They had the same powers as other directors and no more, but as government directors they were to make reports to the Secretary of the Interior in respect of the affairs and matters mentioned in the act of 1864. They could not either by a negative vote or by absenting themselves from the meetings prevent the transaction of the necessary business of the company, in which they were entitled to participate on the same terms as their associates. Congress did not look to any action of theirs for the protection of the public interests but sought to secure those interests by specific legislation. Thus it was provided by the act of 1862 that patents for lands and government bonds should not be issued to the company until the road had been constructed, examined and approved by the commissioners and the facts certified to the President and Secretary of the Treasury; and a forfeiture of the rights belonging to the company and the lands granted to it in case of default on its part to redeem the bonds or any of them when required to do so by the Secretary of the Treasury in

accordance with the provisions of the act, was also provided for.

The joint resolution for the protection of the interests of the United States, 16 Stat. 56; the appropriation act of March 3, 1873, 17 Stat. 485, 508; the Thurman act, 20 Stat. 56; the act amendatory of the fifteenth section of the act of 1862, 18 Stat. 111; the act providing for a commission to investigate the transactions of the company, 24 Stat. 488; are examples of such legislation, and it was through them and not through the agency of the government directors that Congress sought to protect the interests of the government and the public. We regard the position as wholly untenable that this provision for government directors took the corporation out of the general rule that except in cases where the charter imposes a limitation the stockholders are the proper parties to take final action in the management of the corporate affairs.

3. The jurisdiction of courts of equity to decree the specific performance of agreements is of a very ancient date, and rests on the ground of the inadequacy and incompleteness of the remedy at law. Its exercise prevents the intolerable travesty of justice involved in permitting parties to refuse performance of their contracts at pleasure by electing to pay damages for the breach.

It is not contended that multiplicity of suits to recover damages for the refusal of defendants to perform would afford adequate relief, nor could it be, for such a remedy under the circumstances would neither be plain nor complete, nor a sufficient substitute for the remedy in equity, nor would the interests of the public be subserved thereby. But it is objected that equity will not decree specific performance of a contract requiring continuous acts involving skill, judgment and technical knowledge, nor enforce agreements to arbitrate, and that this case occupies that attitude. We do not think so. The decree is complete in itself, is self-operating and self-executing, and the provision for referees in certain contingencies is a mere matter of detail and not of the essence of the contract.

It must not be forgotten that in the increasing complexities

of modern business relations equitable remedies have necessarily and steadily been expanded, and no inflexible rule has been permitted to circumscribe them. As has been well said, equity has contrived its remedies "so that they shall correspond both to the primary right of the injured party, and to the wrong by which that right has been violated;" and "has always preserved the elements of flexibility and expansiveness, so that new ones may be invented, or old ones modified, in order to meet the requirements of every case, and to satisfy the needs of a progressive social condition in which new primary rights and duties are constantly arising and new kinds of wrongs are constantly committed." Pom. Eq. Jur. § 111.

We regard the case of *Joy* v. *St. Louis*, 138 U. S. 1, as determining that this contract was one within the control of a court of equity to specifically enforce. In that case the St. Louis, Kansas City and Colorado Railroad Company acquired by succession, under a contract, the right of running its trains over the line of the Wabash Company from a point on the northern line of Forest Park, through the park and into the Union Depot at St. Louis, together with the right to use side tracks, switches, turnouts and other terminal facilities. It was a continuing right and unlimited in time, and the contract contained provisions regulating the running of trains and prescribing the duties of superintendents, trainmasters and other officers. The objections that are urged against the specific performance of the contract under consideration were urged against the specific performance of that contract and were severally overruled, and it was held that nothing short of the interposition of a court of equity would provide for the exigencies of the situation.

This case was cited with approval in *Franklin Telegraph Co.* v. *Harrison*, 145 U. S. 459. The contract there was one for the use by Harrison Brothers & Co. of a wire of the Franklin Telegraph Company between Philadelphia and New York. It appeared that Harrison Brothers & Co. had been in the possession of a certain valuable contract with the Insulated Lines Telegraph Company, to the rights of which company the Franklin Telegraph Company had succeeded. Desiring to

have that contract terminated, the Franklin Company entered into a new contract with Harrison Brothers, by which the Franklin Company agreed to allow Harrison Brothers the right to put up, maintain and use a telegraph wire on the poles of the Franklin Company. At the expiration of ten years thereafter the wires were to become the property of the telegraph company, after which time the telegraph company was to lease the same to Harrison Brothers for $600 per annum, payable quarterly, and with all the other terms and conditions as they existed before. The ten years having expired Harrison Brothers continued to use the wire, paying the stipulated sum of $600 per annum therefor, but after this had gone on for about three years the telegraph company served notice on Harrison Brothers putting an end to the agreement, whereupon Harrison Brothers filed a bill to restrain the telegraph company from terminating the contract and, to have the same specifically enforced, and this court held that the contract was one proper for specific performance.

The same rule was laid down in *Prospect Park & Coney Island Railroad* v. *Coney Island & Brooklyn Co.*, 144 N. Y. 152, where many authorities are cited.

In *Railroad Co.* v. *Alling*, 99 U. S. 463, this court directed an injunction against the Cañon City Railway Company from preventing the Denver road from using the right of way through the Grand Cañon, and said: "If, in any portion of the Grand Cañon, it is impracticable or impossible to lay down more than one roadbed and track, the court, while recognizing the prior right of the Denver Company to construct and operate that track for its own business, should, by proper orders, and upon such terms as may be just and equitable, establish and secure the right of the Cañon City Company, conferred by the act of March 3, 1875, to use the same roadbed and track, after completion, in common with the Denver Company."

In *The Express cases*, 117 U. S. 1, the express companies sought to restrain the railway companies from refusing to carry express matter on the terms of contracts which had expired, which the court held could not be done, and it was

said : "The legislature may impose a duty, and when imposed it will, if necessary, be enforced by the courts; but, unless a duty has been created either by usage or by contract, or by statute, courts cannot be called on to give it effect."

It was objected in *Joy's case* that the court was proposing to assume the management of the railroad "to the end of time," but Mr. Justice Blatchford, speaking for the court, responded that the decree was complete in itself, and that it was "not unusual for a court of equity to take supplemental proceedings to carry out its decree and make it effective under altered circumstances." And the court applied the principle that considerations of the interests of the public must be given due weight by a court of equity, when a public means of transportation, such as a railroad, comes under its jurisdiction. "Railroads are common carriers and owe duties to the public," said Mr. Justice Blatchford. "The rights of the public in respect to these great highways of communication should be fostered by the courts; and it is one of the most useful functions of a court of equity that its methods of procedure are capable of being made such as to accommodate themselves to the development of the interests of the public, in the progress of trade and traffic, by new methods of intercourse and transportation. The present case is a striking illustration. Here is a great public park, one of the lungs of an important city, which, in order to maintain its usefulness as a park, must be as free as possible from being serrated by railroads; and yet the interests of the public demand that it shall be crossed by a railroad. But the evil consequences of such crossing are to be reduced to a minimum by having a single right of way, and a single set of tracks, to be used by all the railroads which desire to cross the park. These two antagonisms must be reconciled, and that can be done only by the interposition of a court of equity, which thus will be exercising one of its most beneficent functions."

Clearly the public interests involved in the contracts before us demand that they should be upheld and enforced.

4. Doubtless a court of equity may refuse to decree the specific performance of a contract, if it be unconscionable;

or bad faith in the parties seeking its enforcement be shown; or duress or fraud appear; or if it be unjust or inequitable; or if the decree would produce results so inequitable as to be incompatible with the proper exercise of the jurisdiction. But here it appears that the contracts were solicited by the Pacific Company; were fairly made on terms substantially proposed by itself; and that their violation by that company was unjustifiable. The contracts were approved promptly and with unanimity; the consideration appears to have been fair and reasonable; the St. Paul and Rock Island companies abandoned their previous enterprise in reliance on them; they entered upon the performance of the contracts, and large sums of money were expended in carrying them out. The conduct of the Pacific Company was not such as to commend itself to a court of equity, and we can do no better than to quote from the opinion of Mr. Justice Brewer, in deciding the case on circuit: "It is to the higher interest of all, corporations and public alike, that it be understood that there is a binding force in all contract obligations; that no change of interest or change of management can disturb their sanctity or break their force; but that the law which gives to corporations their rights, their capacities for large accumulations, and all their faculties, is potent to hold them to all their obligations, and so make right and justice the measure of all corporate as well as individual action."

*Decrees affirmed.*

MR. JUSTICE SHIRAS dissenting.

To make arrangements with other railroad companies whereby they are permitted to make use of the Missouri River bridge and of the tracks and station-houses within the cities of Omaha and South Omaha may be fairly held to be within the range of the general authority of the Union Pacific Railway Company. Such contracts are not unusual, and are calculated to promote the convenience of the public and the welfare of the railroad companies which enter into them. And if the contracts in question presented such a case, I should have no difficulty in affirming their validity. But, as I read

them, they go far beyond such supposed arrangements, and contain covenants and stipulations which bring them within the condemnation of our previous decisions.

What is granted to the Rock Island Railway Company and to the St. Paul Railway Company is not a mere right or privilege, for a reasonable compensation, and subject to the rules and regulations of the Union Pacific, to run their trains over the bridge and into and out of the city stations, but " the full, equal and joint possession and use of the main and passing tracks" belonging to the lessor company, and extending from Council Bluffs on the east side of the Missouri River to the town of South Omaha, a distance of — miles. Nor is the power of control and management reserved to the Union Pacific Railway Company. The words of the contract, in that particular, are as follows :

" Schedules of rules and regulations for the movement of engines and trains over the several railways hereby let and demised shall be made for each railway by the duly authorized officers of the lessor and lessee companies by which such railways shall at the time be operated. Such schedules shall, as nearly as may be practicable, accord equality of right, privilege and advantage to trains of the same class operated by the lessor and lessee, and shall secure to neither any preference or discrimination against the other. They shall be executed and all trains moved under the immediate direction of the superintendent or other officer of the lessor company. If the parties cannot agree upon the adoption of any schedule, rules or regulation, or as to the modification of any one existing, either party may demand a decision of such controversy by referees as hereinafter directed. The referees are hereby invested with power to prescribe schedules, rules and regulations, and to modify existing ones ; and, in case of wilful disregard by either party of the rights of the other, to award damages to the party injured for injuries sustained because of such wilful act."

The legal effect of these contracts is to create a joint ownership, for 999 years, of an important portion of the Union Pacific's railroad and appurtenances, "a full, equal and joint

possession of its tracks," and a subjection to rules and regulations prescribed by the duly authorized officers of the lessor and lessee companies, and, in case of disagreement, subjection to the decision of referees, mutually appointed, invested with power to prescribe schedules, rules and regulations, and to modify existing ones.

These contracts, in my opinion, are plainly void within the principles of the following cases: *Thomas* v. *Railroad Company*, 101 U. S. 71; *Branch* v. *Jessup*, 106 U. S. 468; *Pennsylvania Railroad* v. *St. Louis &c. Railroad*, 118 U. S. 290; *Oregon Railway* v. *Oregonian Railway*, 130 U. S. 1; *Central Transportation Co.* v. *Pullman's Car Co.*, 139 U. S. 24. The doctrine of those cases may be sufficiently expressed by the following paragraph taken from the opinion of Mr. Justice Miller in the case of *Pennsylvania Railroad* v. *St. Louis &c. Railroad*, 118 U. S. 309:

"We think it may be stated, as the just result of these cases and on sound principle, that, unless specially authorized by its charter, or aided by some other legislative action, a railroad company cannot, by lease or any other contract, turn over to another company, for a long period of time, its road and all its appurtenances, the use of its franchises, and the exercise of its powers, nor can any other railroad company without similar authority make a contract to receive and operate such road, franchises, and property of the first corporation, and that such a contract is not among the ordinary powers of a railroad company, and is not to be presumed from the usual grant of powers in a railroad charter."

To which may be added the following observations of Mr. Justice Gray in the very recent case of *Central Transportation Co.* v. *Pullman's Car Co.*, 139 U. S. 48:

"The clear result of these decisions may be summed up thus: The charter of a corporation, read in the light of any general laws which are applicable, is the measure of its powers, and the enumeration of those powers implies the exclusion of all others not fairly incidental. All contracts made by a corporation beyond the scope of those powers are unlawful and void, and no action can be maintained upon them in the

courts, and this upon three distinct grounds : the obligation of every one contracting with a corporation to take notice of the legal limits of its powers; the interest of the stockholders not to be subjected to risks which they have never undertaken ; and, above all, the interest of the public, that the corporation shall not transcend the powers conferred upon it by law."

In commenting upon that clause of the contracts in which the Union Pacific Company "lets the Rock Island Company into the full, equal and joint possession and use of its main and passing tracks," the opinion of the court states that "the possession here spoken of was such possession as the Rock Island Company would have when its engines, cars and trains were running over the tracks. The company had no possession before its trains came on the tracks or after they had run off of them, and while its trains were on the tracks its possession was only of the particular part occupied temporarily while running over them."

But this view, I submit, overlooks the necessary meaning of the language of the contracts. The possession, whose right is given, is described as full — that is, entire, not imperfect, or insufficient; as equal — that is, as great as that of the lessor company; as joint — that is, united in interest and obligation with the other party. If doubt could be entertained of the meaning of language so explicit, such doubt would be removed by the other express provisions that the "schedule of rules and regulations shall, as nearly as may be practicable, accord equality of right, privilege and advantage to trains of the same class operated by the lessor and lessee, and to trains of a superior class operated by either a preference over trains of an inferior class operated by the other — all rules and regulations shall be reasonable and just to both lessor and lessee, and shall secure to neither any preference or discrimination against the other."

Again, the opinion states that "moreover, all trains were to be moved under the direction of an officer of the Pacific Company. The Rock Island trains coming upon a Pacific track immediately passed from the control of the Rock Island Com-

pany into that of the Pacific, and its officials were subject to the orders of the Pacific's officers."

I am unable to so read any provision of the contract. On the contrary, as already stated, it is expressly stipulated that "the schedules of rules and regulations for the movement of engines and trains over the several railways hereby let and demised shall be made for each railway by the duly authorized officers of the lessor and lessee companies by which such railways shall at the time be operated;" and if the parties cannot agree upon such rules and regulations, then mutually appointed referees shall exercise authority to "prescribe schedules, rules and regulations and to modify existing ones." The plain meaning, as I think, of these contracts is that the Union Pacific Railway Company has thereby parted with its sole and absolute control of those portions of its road and tracks that are embraced within the scope of the contracts, and with the sole and absolute power to exercise its franchises to occupy, possess and operate such portions of its road, and has agreed to participate, for a period of 999 years, with other railway companies, in the full, joint and equal possession of those portions of its road, in their physical aspect, and to confer upon such other companies the right to join, on equal terms, in the making of all rules and regulations pertaining to the use and management thereof. When a contract provides for the possession of a railroad and for its operation by rules and regulations it has covered everything that exists — the road as a physical structure, and the franchises to operate it by rules and regulations.

It is true that the contract provides that the rules and regulations "shall be executed and all trains moved under the immediate direction of the superintendent or other officer of the lessor company." But the duties of such an officer are subordinate. He is to carry out the rules and regulations prescribed jointly and equally by the lessor and the lessee companies, and the meaning and effect of the provision in question is to prevent the confusion that would result if there were two superintendents to enforce the same rules over the same portions of railroad.

The opinion of the court disposes of the cases hereinbefore cited by the observation that they arose upon instruments which dispossessed the corporations of all their property and of all capacity to perform their public duties, and that such is not the case here.

But the reason why the contracts in those cases were held void was not because they embraced all the property of corporations, but because the companies sought to part with the possession and control of their property without legislative authority for doing so. Can that be a sound view which, while admitting that the Union Pacific Railway Company is forbidden to lease the possession and control of its road to another company without authority expressly given, yet would hold that that company may, without such authority, part with the possession and control of one half or of any appreciable part of its road? Can it be maintained that, while the Union Pacific Railway Company cannot lease its railroad from Council Bluffs to Ogden, it may contract with the Rock Island Railway Company to give it joint and equal possession and management of its road between those points? And, in point of principle, if such a contract would be void if embracing the road between Council Bluffs and Ogden, how could it be declared valid if embracing the road between Council Bluffs and South Omaha?

The views of the majority seem to me to overlook the essential question, and that is, the power of the Union Pacific Railway Company to part with its road and franchises, temporarily or forever, in whole or in part. A contract by that company to share its road and those powers, called franchises, which are necessary to operate it, is just as much forbidden by the principle of the cases as a contract to lease its road as an entirety. The objection to an irrevocable contract for 999 years that the Union Pacific Railway Company may hereafter need to use its tracks and franchises in their entirety, is not satisfactorily met by the suggestion that, in such event, the courts can, in some way, relieve the company from the contract. It is not easy to see how an engagement now held valid can be hereafter dispensed with.

The Union Pacific Railway does not hold and exercise the

powers conferred on it by Congress, subject to the control
and approval of the courts. Nor is it competent for the courts
to enforce or relax, at their will and according to their views
of expediency, the obligations of contracts into which the
railway company may have entered.

Other provisions of these contracts which seek to subject
the Omaha and Republican Valley Railway Company and the
Salina and Southwestern Railway Company to the use of
the Rock Island and St. Paul companies, and which render
the Union Pacific Railway Company liable as lessee of rail-
roads owned by the Rock Island Company, are, in my judg-
ment, equally without authority of law. But it is scarcely
worth while to consider them minutely. As this is a proceed-
ing to enforce specific performance of the entire contract,
invalidity of any important part of the contract, but for
which it would not have been entered into at all, is enough
to defeat the bill.

It is scarcely necessary to say that if these contracts were
void for the reasons given, no action taken under them would
justify a court of equity in enforcing them. As was said in
*Thomas* v. *Railroad Co.*, above cited: "In the case of a con-
tract forbidden by public policy and beyond the powers of
the defendant corporation, it was its legal duty — a duty
both to the stockholders and the public — to rescind and
abandon the contract at the earliest moment, and the per-
formance of that duty, though delayed for several years, was
a rightful act when done, and could give the other party no
right of action, and that to hold otherwise would be to hold
that any act performed in executing a void contract makes all
its parts valid, and that the more that is done under a con-
tract forbidden by law, the stronger is the claim to its en-
forcement by the courts."

"A contract *ultra vires* being unlawful and void, not be-
cause it is in itself immoral, but because the corporation, by
the law of its creation, is incapable of making it, the courts,
while refusing to maintain any action upon the unlawful con-
tract, have always striven to do justice between the parties,
as far as could be done consistently with adherence to law, by

permitting property or money, parted with on the faith of the unlawful contract, to be recovered back or compensation to be made for it. In such case, however, the action is not maintained upon the unlawful contract, nor according to its terms, but on an implied contract of the defendant to return, or, failing to do that, to make compensation for, money or property which it has no right to retain. To maintain such an action is not to affirm, but to disaffirm, the unlawful contract."

I think that the judgment of the Circuit Court of Appeals should be reversed and the cause remanded to the Circuit Court with directions to set aside its decree and dismiss the bill.

MR. JUSTICE GRAY likewise dissented.