## 11446

### WELLING *ET AL.* v. CROSLAND *ET AL.*

#### (123 S. E., 776)

1. SPECIFIC PERFORMANCE—COMPLAINT AND EXHIBITS HELD TO SHOW THAT SIGNERS OF TRUST AGREEMENT CONTRACTED TO PURCHASE LAND.—Complaint and exhibits *held* to show an executory contract between plaintiffs and signers of a trust agreement to purchase plaintiffs' land.

2. VENDOR AND PURCHASER—OPTION TO PURCHASE REALTY ASSIGNABLE. —An option to purchase real estate is assignable.

3. ASSIGNMENTS—ASSIGNEE ASSUMING ASSIGNOR'S ENGAGEMENTS LIABLE THEREFOR.—Where assignee assumes asignor's engagements with the knowledge and consent of other party, who acted upon such engagements, assignee is liable therefor.

4. SPECIFIC PERFORMANCE—THAT DEFENDANTS PURCHASED LAND FOR RESALE AT PROFIT HELD NOT TO PREVENT DECREE.—Where syndi-

---

NOTE.—On assignability of option to purchase property see Notes 21, L. R. A., 127; 43, L. R. A., (N. S.), 115.

cate contracted to purchase land, paid part of purchase price and entered into possession, equity will not refuse specific performance to vendors on theory that transaction was a gambling contract, merely because syndicate expected to sell land at auction and realize profits.

5. SPECIFIC PERFORMANCE—ENFORCEMENT OF CONTRACT TO SELL LAND TO SUBSCRIBERS TO TRUST AGREEMENT NOT DENIED MERELY BECAUSE EACH SUBSCRIBER'S OBLIGATIONS IS SEVERAL.—Specific performance to vendors of land against subscribers to a trust agreement will not be denied, merely because obligation of each subscriber is several and not joint and each subscriber is liable only to extent of his subscription; for, if any one subscriber complies with decree and pays his subscription, he would be entitled to his proportional interest in land.

6. VENDOR AND PURCHASER—THAT ONE OF VENDORS OF LAND SOLD TO SUBSCRIBERS TO TRUST AGREEMENT WAS SUBSCRIBER HELD NOT TO RELIEVE OTHER SUBSCRIBERS FROM THEIR OBLIGATIONS.—That one of the vendors of land sold to subscribers to a trust agreement was one of the subscribers and known to other subscribers as such, does not relieve other subscribers from their obligation under sale contract.

7. VENDOR AND PURCHASER—FAILURE OF VENDOR, WHO IS ALSO SUBSCRIBER, TO AGREEMENT TO PURCHASE, TO PAY HIMSELF HIS PROPORTION OF PURCHASE PRICE NOT ABANDONMENT OF ENTERPRISE.—Where one of the vendors of land sold to subscribers of a trust agreement was also a subscriber thereto, his failure to pay himself his proportion of the purchase price *held* not abandonment of enterprise, in view of other subscribers' failure to perform.

8. VENDOR AND PURCHASER—SALE TO SUBSCRIBERS OF TRUST AGREEMENT VALID, THOUGH VENDORS KNEW OBLIGATION OF SUBSCRIBERS WAS SEVERAL.—Where vendors of land sold to signers of a trust agreement with knowledge that signer's liability under trust agreement was limited to amount of subscription, they abandoned the idea of holding all subscribers for default of any one, but otherwise they had as valid a contract as if liability of subscribers had been joint and several.

9. JOINT ADVENTURES—PARTNERSHIP—DIFFERENCE BETWEEN "JOINT ADVENTURE" AND "PARTNERSHIP" STATED.—Practically the only difference between a "joint adventure" and a "partnership" is that a partnership is ordinarily for transaction of a general business of a particular kind, while a joint adventure relates to a single transaction; both are governed by the same rules of law.

10. JOINT ADVENTURES—PARTNERSHIP—WITHDRAWAL OF MEMBER DOES NOT RELIEVE HIM FROM OBLIGATIONS ASSUMED WHILE A MEMBER.—

While as between themselves a member of either a partnership or a joint adventure may withdraw subject to accountability for damages done to the others he cannot by withdrawing relieve himself from obligations assumed while he was a member.

11. JOINT ADVENTURES—PARTY DEALING WITH MEMBERS WITH KNOWLEDGE OF LIMITATIONS OF LIABILITY CONCLUDED THEREBY.—Where a party deals with members of a joint adventure with knowledge of and consents to their several liability, he is concluded thereby.

12. SPECIFIC PERFORMANCE—COMPLAINT NOT DISMISSED, THOUGH SPECIFIC PERFORMANCE DENIED.—Where it is conceded that plaintiffs have a remedy at law *held*, that complaint should not be dismissed even if specific performance is denied.

13. SPECIFIC PERFORMANCE—COMPLAINT HELD TO STATE FACTS ENTITLING TO RELIEF.—Complaint by vendors to enforce executory contract for sale of land, *held* to state facts making it error for Court to refuse relief asked.

14. SPECIFIC PERFORMANCE—DEMURRER NOT SUSTAINED, WHERE COMPLAINT SHOWS PRIMA FACIE CASE FOR SPECIFIC PERFORMANCE.— Where complaint shows a *prima facie* case for specific performance, and question whether that relief should be granted depends upon a showing to be made by defendants that there are equitable considerations involved justifying a refusal of that remedy, that question should not be entered into on a demurrer to the complaint.

Before SHIPP, J., Darlington. January, 1923. Orders affirmed.

Action by L. S. Welling and others against T. C. Crosland and others, from an order refusing to move the case for trial to Marlboro County, and from an order over-ruling a demurrer to the complaint, defendants appeal.

*Messrs. Spears & Want, C. L. Prince* and *D. W. Robinson,* for appellant, cite: *Remedy of specific performance:* 4 Pom. Eq. (4th Ed.), pp. 3320-1, 3330-32; 5 Pom. Eq. (4th Ed.), 4869; 114 S. C., 245; 111 S. E., 891; 116 S. E. 97; 120 S. C., 317. *Doctrine of stare decisis:* Black on Jud. Pre. 189-190. *Judicial notice of unusual conditions:* 15 R. C. L., 1093. *Specific performance-intention:* 5 S. C., 450; Contract 72 N. E., 719; 27 So., 391. *Redress:* 27 A. S. R., 173; 25 So., 631; 17 S. E., 818; 30 So., 488. *Joint*

*adventure and partnership:*    20 R. C. L., 875; 954-5; 28 So., 169; 10 Cuch., 427; 30 Cyc., 446-7; 43 Hun., 82; 69 N. Y., 220; 9 La. Ann., 32.    See Joint Adventure in R. C. L. & C. J., also note 17 Ann. Cas., 1022 et seq; 30 Cyc, 360, 651, 653; Equity, 1 Pom. (4th Ed), Sec 378, also p. 372. *Remedy:*    5 Pom. Eq. (4th· Ed), 4891-2.    *Damages:*    25 R. C. L., 346; 176 Fed. 180; 85 N. E., 283; 34 Fed. 239; 114 S. C., 245; 116 S. E., 97.    *Parties to contract in law:* 13 C. J., 262; 9 P. R. Fed. 35; 76 Ill., 355; 13 L. R. A., 676; 2 Mill, 428; 6 Pick 316; 132 Mass., 318.    *In equity:* 1 Rich. 34; 4 Rich. Eq., 168; 2 Mill Const., 428;    *Venue:* Code of C. P., Sec. 355-338:    26 Pac., 356; 154 Pac., 476; 43 Pac., 887; 21 R. C. L., 495.

*Messrs. Miller & Lawson, Lide & McCandlish* and *Geo. H. Edwards,* for·respondents, cite :    *Specific Performance:* 48 S. C., 175; 107 S. C., 465; 93 S. C., 350; 21 S. C., 112; Rich Eq. Cases, 235; 113 S. E., 128; 117 S. C., 480.    *Parties to contract:*    2 Mill, 428; 1 Rich. 34; 4 Rich. Eq, 168. *Form will not defeat substance:*    5 S. C., 450; 82 Am. St. Rep., 647.    *Obligations several not joint:*· Code of C. P., 1922, Sec 167-169; Pom. on Code Remedies (4th ed.), 255. *Change of venue:*    103 S. C., 477.

March 14, 1924.

The opinion of the Court was delivered by MR. JUSTICE COTHRAN.

Action for the specific performance of a contract for the sale of real estate.    The appeal is from an order of Hon. S. W. G. Shipp, Circuit Judge, refusing to move the case for trial to Marlboro County, and from an order of the same Judge overruling a demurrer interposed by the defendants (with the exception of D. D. McColl) to the complaint.

The facts of the case, admitted by the demurrer, are succinctly stated as follows:

The plaintiffs, L. S. Welling and his wife, Mrs. Agnes Welling, at the time of the occurrences hereinafter stated,

owned a large body of land in Darlington County, containing about 2,500 acres. The defendants Crosland & Tyson were real estate dealers and promoters and managers of auction sales of land. It was in March, 1920, before the effects of "deflation" became so disastrous. On March 3, 1920, Crosland & Tyson secured from Mr. and Mrs. Welling an option upon said land at $100.00 per acre, aggregating about $250,000, payable $10,000 on May 1, 1920, and the remainder on December 31, 1920. Crosland & Tyson then induced the other defendants (16 in number) and the plaintiff L. S. Welling to join in an enterprise by which the property should be bought from the Wellings, an auction sale should be held, and the profits divided, each of the subscribers, including Welling and the two members of the firm of Crosland & Tyson, taking $12,000, except Exum & Co., who took $25,000, making up the estimated purchase price of $250,-000, payable as above stated. Accordingly on April 26, 1920, a contract, called a "Trust Agreement," was entered into by and between the subscribers to the syndicate, by which each subscriber was to pay to Crosland & Tyson his proportionate part of the $10,000 initial payment due May 1, 1920, and his proportionate part of the estimated balance, $240,000, due December 31, 1920; that Crosland & Tyson should pay the $10,000 due on May 1, 1920, to, and should obtain from, the Wellings a contract showing that when the estimated balance was paid on December 31, 1920, they would make to Crosland & Tyson as trustees a fee-simple title, free of all incumbrances; that Crosland & Tyson should hold the Welling sales contract and the deed after December 31, 1920, as trustees, for the benefit of the subscribers to the syndicate; that they should make such use of the land as should be determined by three-fourths of the syndicate, and should sell it at auction or farm or rent it, as should be so determined. Provision was made for commissions from the Wellings to Crosland & Tyson, on the original sale, and commissions to them on the auction sale if it should be

had. It was specifically stipulated in this agreement between the members of the syndicate:

"It is stipulated that each of the stockholders shall only be liable for the full amount he has agreed to pay into the syndicate; that it is a several obligation, and not a joint one. In case any one of the parties hereto should !fully pay and discharge his own obligation, he is not to be called upon for any other or additional sum of money; but it is understood that, if loss should result from the transaction, the loss to be equally borne, in proportion to the original subscriptions, which are shown by the following schedule."

The provision for the payment of the $10,000 due on May 1, 1920, to Crosland & Tyson was complied with, and they paid the same to the Wellings. Thereupon a contract was entered into by and between the Wellings and Crosland & Tyson, dated in the first part of it April 28, 1920, and in the last part of May 1, 1920, in which the Wellings acknowledged receipt of the $10,000.00 and agreed to—

"execute and deliver in escrow to the Carolina National Bank a deed conveying a fee-simple estate of the said lands to be delivered by the said bank to the parties of the second part, or their order, on or before January 2, 1921, if the said parties of the second part shall pay the balance of the purchase price before the delivery of the deed, at the rate of one hundred dollars ($100.00) per acre, to be determined by a survey made before the date of the delivery, by J. M. Johnson, of Marion, S. C."

It was also agreed as follows:

"It is stipulated that T. C. Crosland and J. W. Tyson are to take title for said tract of land as trustees, to hold for the benefit of themselves, and a number of other persons who have contributed and are to contribute to the payment of the purchase price; that the parties of the first part, as security for the due payment of the balance of the purchase price, are to be subrogated to all the rights of Crosland & Tyson in the trust agreement dated April 26, 1920, whereby

the said parties agreed to pay each his proportionate share of the purchase price. This obligation, however, is understood to be a several obligation, and not a joint one; that is to say, that each of the parties shall pay only his proportionate part of the unpaid purchase price."

It was also agreed that the proposed auction sale might take place before the actual delivery of the deed. The sales contract contained also the following:

"It is stipulated and understood that this contract and the deed delivered in escrow represents a final binding sale of the premises and the parties of the second part bind and obligate themselves to take the said land, to receive the deed delivered in escrow, and to pay the balance of the purchase price in accordance with the survey, and, in the event they fail to do so, that the retention of the ten thousand dollars ($10,000.00) before mentioned shall not be regarded as any discharge or release. The parties of the second part are to pay the balance of the purchase price, and receive title."

The plaintiffs have duly executed and placed in escrow the deed, in compliance with the foregoing agreement.

The land was resurveyed and found to contain 2,618.7 acres, and the balance due upon the contract is $261,870, less $10,000 paid—$251,870.

During the year 1920 the defendants entered upon the land for the purpose of surveying and selling it and made arrangments for its cultivation in 1921.

The plaintiffs stand ready to comply with the agreement, and, in case any of the defendants pay their proportionate part of the balance due, to convey to each purchaser an interest in said tract of land proportionate to the amount of the purchase money for which each is liable under the terms of the said agreement, upon payment thereof.

The plaintiff L. S. Welling has always been and still is ready and willing to perform the agreement on his part for the purchase of said lands, in accordance with the terms of

said agreement, and to pay the proportion of the purchase money therefor for which he is liable under the terms thereof, and has repeatedly notified the defendants, along with W. J. Crosland (since deceased), of his readiness and willingness to pay his proportion of the purchase money and to accept the deed of conveyance, in accordance with the terms of the said agreement.

The defendants have refused to accept the deed of conveyance executed and delivered in escrow to the Carolina National Bank, in accordance with the terms of their agreement, on or before January 2, 1921, and have ever since refused to accept the same and to pay the balance of the purchase money in accordance with the terms of said agreement.

The defendants challenge the right of the plaintiffs to a decree of specific performance, in equity, upon the following grounds, which will be considered in their order:

1. That the complaint and exhibits show that there never has been an executory contract between the plaintiffs and the signers of the trust agreement with the Wellings, to purchase the land in controversy.

The contention of the defendants is that they assumed and incurred no obligation to the Wellings, by reason of the so-called "Trust Agreement" of April 26, 1920, as expressed in the appellants' printed argument: "No obligation with any seller or other third party is created directly or by implication."

Let us see whether on not this statement is true: Crosland & Tyson held an option dated March 3, 1920, upon the property, from the Wellings, at $100 per acre. The terms of the option were $10,000 cash on May 1, 1920, and the remainder payable on December 31, 1920. The estimated quantity was 2,500 acres, which would make the purchase price $250,000. On April 26, 1920, the trust agreement was executeod, a few days before the initial payment of $10,000 upon the original option was due. The agreement in its preamble recites:

"Whereas the parties hereto desire to become the purchasers of said lands, and pay for the same in proportion to their subscriptions, as hereinafter indicated, both as to the payment of ten thousand dollars ($10,000.00) on May 1st, and the balance, estimated to be two hundred and forty thousand dollars ($240,000.00), on October 1, 1920."

From whom did they "desire" or expect to buy, but from the Wellings? They certainly did not expect to buy from Crosland & Tyson, for they did not have the title. They agreed moreover:

"To pay their proportionate part of the sum of ten thousand dollars ($10,000.00) on May 1st, as well as their proportionate part of the remainder, estimated at two hundred and forty thousand dollars ($240,000.00), on December 31, 1920. Each of the parties hereto is to get up his part of the cash payment promptly, and have the same in the hands of Crosland & Tyson in ample time to permit payment to be made to the Wellings."

Not only that, but they directed Crosland & Tyson to pay the $10,000 to the Wellings and obtain from them a sales contract binding them upon completion of the payments, which they agreed to make to the Wellings, to execute a deed conveying the property to Crosland & Tyson as trustees "for the benefit of all the parties to this contract," and that a three-fourths majority of the subscribers should determine the dispostition of the property, by auction sale, farming, or renting.

Within a few days after the date of the trust agreement of April 26, 1920, to wit, on April 28, 1920 (or May 1st), Crosland & Tyson did exactly what the subscribers authorized and directed them to do and no more. The latter having ratably provided the $10,000 for the initial cash payment, Crosland & Tyson paid it to the Wellings, and obtained from them the sales contract in exact conformity with the trust agreement. The only noticeable addition is the provision that the Wellings should be subrogated to the rights of Cros-

land & Tyson against the subscribers; a provision that was entirely superfluous, if the whole transaction created privity between the Wellings and the subscribers. In view of the express provisions in the sales contract of April 28, 1920, that "each of the stockholders shall only be liable for the full amount he has agreed to pay into the syndicate, that it is a several obligation and not a joint one," the statement of counsel for the appellants that "the later agreement of sale creates a joint liability for an aggregate single sum as the purchase price of property," is quite inexplicable.

The fact that in the trust agreement Crosland & Tyson were allowed a commission upon the sale by the Wellings is proof conclusive that it was expected and agreed that the syndicate should purchase from the Wellings; for surely Crosland & Tyson would not have been entitled to commissions on a sale from the Wellings to themselves. The manifest purpose of the transaction was a practical assignment of Crosland & Tyson's option to the subscribers, consented to and adopted by the Wellings in and by their sales contract with Crosland & Tyson, who were acting under the express direction of the subscribers and were constituted trustees by and for them.

Upon the assignment of the option of Crosland & Tyson to the syndicate, the unequivocal acceptance of it by them, the payment of the initial cash payment of $10,000, and the consent of the Wellings to the assignment, the syndicate stepped into the shoes of Crosland & Tyson, became entitled to enforce the terms of the option thus converted into an executory contract, and were as a necessary corollary obligated by its terms. They became by their own conduct inseparably linked to the contract of sale and in privity with the Wellings, "a relation which creates obligations."

That an option to purchase real estate is assignable 2, 3   is confirmed by a large number of cases which may be found in note to 43 L. R. A. (N. S.), 115, and to 21 L. R. A., 127. While there may be doubt as to the liability

of an assignee for the engagements of the assignor, upon a
simple assignment of contract (2 R. C. L., 627), there can be
no doubt that he would be liable where, under the conditions
of the assignment, he assumed them, and with the knowledge
and consent of the other party who acted upon such en-
gagements. *Fleming v. Law,* 163 Cal., 227; 124 Pac., 1018.
*Anderson v. R. Co.,* 132 App. Div., 183; 116 N. Y. Supp.,
954. *Atlanta R. Co., v. Atlanta R. Co.,* 147 N. C., 368;
61 S. E., 185. *Younce v. Lumber Co.,* 148 N. C., 34; 61
S. E., 624. *Campbell v. Dist. Col.,* 117 U. S., 615; 6 Sup.
Ct., 9212; 29 L. Ed., 1007. *Bash v. Boston Co.,* 16 Mont.,
467; 41 Pac., 75.

"An assignee of a share of property received as security
for a debt, who agrees to comply with the contract of the
assignor with a joint owner, is bound to fulfill such a con-
tract, though it exceed in amount the value of the share as-
signed." *Clark v. Carrington,* 7 Cranch, 308; 3 L. Ed.,
354.

"The assignee of a contract is bound by the same equi-
ties which existed between the original parties to the con-
tract, having purchased with a full knowledge of the state
of things." *Kinsman v. Parkhurst,* 18 How., 289, 15 L.
Ed., 385.

"Where the purchaser under a contract for the sale of
real estate, assigns his interest in the contract, after having
paid only part of the purchase money, the assignee in ac-
cepting the assignment, becomes a party to the contract,
and is personally liable for the unpaid purchase money, al-
though he may have sold the property to another." *Wight-
man v. Spofford,* 56 Iowa, 145; 8 N. W., 680.

"Plaintiff assigns a contract for the purchase of land to
defendant, who, in consideration thereof, agreed to make
the payments to the vendor as they became due under the
contract. Held that, by such agreement, defendant made the
debt his own, and it was not one of indemnity only." *Nor-
trip v. Hermans,* 16 Misc. Rep., 313; 39 N. Y. S., 415.

"The assignee of a contract, who acquires the right to enforce the executory provisions thereof, or to recover damages for the breach, assumes the burdens which are imposed upon the assignor by the contract, as the consideration for the performance by the other party." *Blue Star Co. v. Emmons Co.,* 276 Pa., 352; 120 Atl., 459.

"In other words, by the very act of assignment of such a contract and its acceptance by the assignee, the privity in estate created between the landlord and the original lessee by the lease passes out of the original lessee into the assignee, for the reason that thereby a right in or to the land itself passes." *Mound Valley Co. v. Mound Valley Co.* (C. C.), 258 Fed., 936.

"An assignee does not become liable on an executory contract of the assignor unless by his contract he assumes such liability." *Lunt v. Lorscheider,* 285 Ill., 589; 121 N. E., 237.

"But on the other hand, it is held that the assignee of a contract, who acquires the right to enforce the executory provisions thereof, or to recover damages for the breach, assumes the burdens which are imposed upon the assignor by the contract as the consideration for the performance by the other party. If the assignee expressly promises in the contract of assignment, upon a valuable consideration, to pay third parties, such third parties may sue him on his promise." 5 C. J., 997.

"Where, by the consent of all parties interested, the assignee is substituted in place of the assignor, he becomes liable to the other contracting party upon all the obligations of the asignor." 5 C. J., 977.

We have not a doubt therefore but that the syndicate understood, as their agreement provides, that they were entitled to enforce the executory contact against the Wellings; and it follows reciprocally and most justly that they assumed the obligation to comply with it on their part, which

presents all of the privity between them and the Wellings that can be required.

These auhorities bear upon the case of an assignment of an executory contract after it has been completed. The assignment is stronger in the case of the actual conversion by the assignees of an option contract into an executory one.

2. That if it should be held that any such executory contract has been established, the same appears upon its face to be speculative and gambling in character.

This case does not come at all within the rule declared in *Schmidt v. Whitten,* 114 S. C., 245; 103 S. E.,553. *Sumner v. Bankhead,* 119 S. C., 78; 111 S. E., 891, and *Scarborough v. Register,* 123 S. C., 59; 116 S. E., 97, where the purchasers never expected to do anything with the land except hold it for a brief time and gamble upon the rise in value. Here the syndicate expected to hold an auction sale and realize profits, but, if that failed, to farm or rent it.

It certainly would be remarkable to hold that a contract for the purchase of land, which had been carried out to the extent of payment of part of the purchase price, an entry upon the land by the purchaser, a survey and division, and an attempted auction sale, should be held so vicious that a Court of Equity would decline to decree specific performance, for the reason that the purchaser contemplated a profit by the transaction.

3. That the liability of the defendants, if any at all, is strictly several and limited as to each defendant to pay certain specific sums of money, and that the remedy therefore by specific performance is not available.

While the obligation of each subscriber is several and not joint, and he is therefore only liable for the purchase price to the extent of his individual subscription, we do not at all agree to the proposition that that is the limit of his obligation under the contract. It might as well be said that the obligation of a single purchaser is limited to the payment of the purchase price; and that his breach of the con-

tract can be satisfied only by the payment of damages. If that be so, there can be no such thing as the specific performance of a contract, requiring the purchaser to do what he engaged to do, to buy the land, pay the purchase price, and accept a deed.

It is suggested as a barrier to a decree for specific performance in this case that, if it should be signed requiring each subscriber to pay his promised proportion of the purchase price and in default that the property be sold and the deficiency entered up against the purchasers, some of them may pay and others fail; that the whole property could not then be sold and the decree would be ineffective; that in this uncertainty the decree should not be signed in view of the practical certainty that it could not be enforced. We see no possible objection to the decree upon these grounds. There are 20 undivided several shares in the syndicate; if any one of the 20 holders complied with the decree by paying his subscription, he would be entitled to a deed conveying him one-twentieth interest in the property; the other 19 defaulting, nineteen-twentieths of the property would be sold and the purchaser would become a tenant in common with the one who paid his subscription, or after such payment and before the sale, upon application by him the Court would pass a supplemental order directing that the entire interest be sold and that he be paid his proportion of the proceeds of sale. This would be entirely optional with him; he might prefer to hold as a tenant in common with the purchaser of the other interests, subject to a later partition.

Objection is urged to this suggestion upon the ground that the trust agreement contemplates a personal combination of the subscribers, exclusively to manage and control the property; a combination that would be defeated by the entry of a new purchaser of an interest. If this objection be sound, the interest of each subscriber would be inalienable, for his assignment would introduce a new member in and disrupt the contemplated personal combination. We

do not apprehend that such a position would seriously be maintained.

4. That the alleged executory contract was made by and between the plaintiffs in the one hand and the plaintiff and other signers of the trust agreement on the other, and is therefore void.

It is true that L. S. Welling was a party to the trust agreement, one of the syndicate. How this fact may relieve the other members from their obligations we cannot conceive. They were aware of it when they entered into the agreement, and as it has turned out, the entry of Welling was a benefit to them rather than otherwise, for he bears his proportion of the purchase price, to that extent relieving the others.

Much is made in the argument of Welling's default as a subscriber, constituting an abandonment by him of the enterprise, such as to relieve the others. The appellants apparently expect Welling to have paid himself his proportion of the purchase price; an absolutely useless ceremony upon his part, in view of the "laying down" of every one of the other subscribers.

5. That the transaction into which the signers of the trust agreement entered is a joint adventure.

That the defaults on the part of the defendants constituted an abandonment of the enterprise while it was yet executory, and an action at law for damages is the only remedy in such a case.

Practically the only difference between a "joint adventure" and a "partnership" is that a partnership is ordinarily for the transaction of a general business of a particular kind, while a joint adventure relates to a single transaction. A joint adventure was unknown to the common law, being regarded as within the principles governing partnerships; it is still governed by the same rules of law. 23 Cyc. 453.

What advantage can accrue to the defendants from characterizing the transaction as a joint adventure, we fail to see, so long as the general rules of partnership are applicable to it. While, as between themselves, a member of either may withdraw, subject to accountability for damage done to the others, he cannot by withdrawing or abondonment, relieve himself from obligations assumed while he was a member. In the formation of a joint adventure, the members may lawfully stipulate among themselves as to their joint or several liability; and a party dealing with them with knowledge of and consent to a several liability, as was done in this case specifically, would necessarily be concluded by such knowledge and consent; but this cannot in any way affect the ability of the joint adventure to make a contract or its obligation to comply with its terms. The Wellings connected themselves with the trust agreement with knowledge of the provision as to several liability; they consented to it in the sales contract; the risk of some members of the syndicate failing to carry, they took out his several obligation; they abandoned the idea of holding the others for his default; but otherwise they had as valid a contract of the "joint adventure" as if the liability of the members had been joint and several.

6. That the remedy in equity for specific performance having been improperly invoked, the Court should not entertain the question whether or not, and if so to what extent, the defendants may be held liable in damages.

Even if it should be held that the Court of equity should deny the remedy of specific performance, we do not think that the complaint should be dismissed; for it is conceded that in such event the plaintiffs have their remedy at law.

One of the great benefits of the reformed procedure in abolishing the distinction between Courts of law and Courts of equity was to abolish the practice of bandying the parties from one forum to another; to create one tribunal which

should determine his rights as the pleadings showed him entitled to.

Under the old system, of course, if the plaintiff entered the Court of equity and failed to show that he was entitled to specific performance, he was promptly dismissed; the Court of equity would not retain his case to try the issue of damages, for the reason that it possessed no machinery for the disposition of that issue; but there is no reason now why the same Court, as a Court of law, may not dispose of it. The authorities cited by the appellants are appropriate to the old system, when a Court of equity was of course incapable of determining the strictly legal issue of damages.

The rule so frequently applied, that the relief will be denied if the party seeking it has an adequate remedy at law, is objectionable for the reason that it necessarily involves a second inquiry, whether or not that adequate remedy exists. The more modern authorities prefer a simpler, more intelligible, and more workable rule, particularly in reference to executory contracts for the sale of land, which eliminates the second inquiry referred to, and declares that the party complaining of a breach of such a contract has as high a legal right to invoke the aid of a Court of equity to decree specific performance as of a Court of law to award damages; the limitation upon his application to a Court of Equity, however, being that, if there appear in the case circumstances within the purview of acknowledged equitable cognizance which, in the discretion of the chancellor, render it inequitable that such relief be accorded, the application will be denied and the plaintiff remitted to his remedy at law for damages. Accordingly it has been held in numerous cases that, unless the Court of Equity can base its denial upon some fixed principle of equitable jurisprudence, such as fraud, misrepresentation, unconscionableness, imposition, laches, illegality, and others, the denial is arbitrary and capricious, is violative of a plain legal right. See the authorities cited in the case of *Sumner v. Bankhead,* 119 S. C., 78;

111 S. E., 891, which do not lose their applicable force by the fact that they are incorporated in an opinion which did not receive the sanction of a majority of the Court.

"Where a contract is fairly established in which one of the parties bound himself to sell or did sell specific real property, a *prima facie* right to have such a contract specifically enforced arises. If nothing is made to appear which could influence or invoke the discretion of a Court of Equity to justify its refusal to decree specific performance, a decree requiring the party to perform must follow." 2 Story Eq. Jur. (14th Ed.), § 1023; 25 R. C. L., 271; 36 Cyc., 552; 3 Pom. Eq. Jur. (Ed., 1883), § 1404.

To deny the right to the decree and remit the plaintiff to an action at law for damages is to accord the choice of proceedings to him who is in default, an option which fairly belongs to the other.

"The jurisdiction of chancery to decree specific performance prevents the travesty of justice involved in permitting parties to refuse performance of their contracts at pleasure by electing to pay damages for the breach." *Union P. R. Co. v. Chicago R. Co.,* 163 U. S., 564; 16 Sup. Ct., 1173; 41 L. Ed., 265.

"Doubtless a Court of Equity may refuse to decree the specific performance of a contract, if it be unconscionable; or bad faith in the parties seeking its enforcement be shown; * * * or if it be unjust or inequitable; or if the decree would produce results so inequitable as to be incompatible with the proper exercise of the jurisdiction." *Union P. R. Co. v. Chicago R. Co.,* 163 U. S., 564; 16 Sup. Ct., 1173; 41 L. Ed., 265.

In the case of *Columbia Water Power Co. v. Columbia,* 5 S. C., 225, the contract for construction of waterworks had been assigned by the original contractor to one who completed it, within the knowledge and by the presumed consent of the city. It was held that the assignee had the right to relief in equity to enforce specific performance of

the contract on the part of the city. That conclusion would necessarily lead to the further conclusion that, in the event of a breach by the assignee, the city could have a reciprocal right against him.

"It seems, from what is said by all elementary writers on this subject, that the specific performance of agreements is not an absolute right in the party, but a question of sound discretion in the Court; not that the exercise of this discretion is either arbitrary or capricious, but is, like all other judicial powers, dependent upon principle and precedent." *Gasque v. Small,* 2 Strob Eq., 72.

The inappositeness of the rule that equity will not enforce specific performance where the demandant may be compensated by damages in an action at law, may be thus illustrated: John Doe owns a home in the country. He wishes to move into town, and bargains his home to Richard Roe. He then purchases a home in town upon the same terms he had given Richard Roe, expecting to pay his vendor with the money Richard Roe agreed to pay him. Richard Roe defaults upon his engagement. John Doe then has two places upon his hands when he wants only one. He has of course his remedy against Richard Roe for damages at law, but that will not relieve him. His damages would be the difference between the price Richard Roe agreed to pay and the market value of the country home. The jury may say that there is no difference or that it is a certain amount. John Doe still has the country home on his hands and may be unable to realize upon it so as to take care of his own contract for the town home. He makes default and has to give up the town home and pay damages. On the other hand, allow John Doe a decree of specific performnace against Richard Roe. If the latter fails to meet the decree, the place is sold and a judgment entered for the deficiency. John Doe takes the proceeds of sale and settles with his vendor, retains his town home, and is not discommoded. Why should he be made to suffer all of the inconvenience sug-

gested by the default of Richard Roe? Rather, we think, he should be allowed to choose between the two remedies, and not be denied what is so much to his convenience, unless there be some exceptional circumstance which renders that relief inequitable, a simple, easily understood, just and workable rule.

In *Saverance v. Lockhart,* 57 S. C., 131; 35 S. E., 505, it is said:

"Specific performance will be decreed in behalf of a vendee [and the same rule will apply to a vendor, we assume], when he shows his willingness and offers to comply, and that his failure to comply was due to no laches on his part, when nothing appears to show that performance by the vendor [or vendee, when the vendor is plaintiff] is impossible or inequitable."

See, also, *Davenport v. Latimer,* 53 S. C., 563.

In *Secrest v. McKenna,* 1 Strob. Eq., 356, it is said:

"The complaint * * * had a remedy against the defendant in an action at law, on the bond conditioned to make titles, but for the purpose of obtaining more perfect relief he has come into this Court to obtain a specific execution of the contract. The exercise of this power is now universally conceded to this Court, as belonging to its extraordinary jurisdiction, founded entirely on the equity which a party has to have a literal fulfillment of his contract, which could not be obtained at law."

In *Gregorie v. Bulow,* Rich. Eq. Cas., 235, in an elaborate opinion by Judge O'Neall, which has been frequently cited, it is said:

"The jurisdiction of the Court of Equity over the specific performance of contracts for the sale of lands, is as ancient as the Court itself. That the party could have remedy at law in damages, is no answer to the claim of jurisdiction. * * * The proceeding by bill for a specific performance of a contract for the sale of the lands is to be encouraged, instead of being discouraged. For in one case it ends all

litigation between the parties. * * * I am aware that in some cases it is said, where the party can be compensated in damages, the Court of Equity will not decree specific performance. But that applies to cases where both parties would, on the contract, be referred to a Court of law. * * * [Quoting from 1 Madd. Ch., 361.] 'If a contract has been entered into by competent parties, and is in the nature and circumstances of it unobjectionable, it is as much of course in a Court of Equity, to decree a specific performance, as it is to give damages at law.' "

It is interesting to note that in this case a former decision of the Court in the case of *Bacon v. Roche* (rendered December, 1829, but not reported) was distinctly overruled. In that case a bill was filed by the vendor against the vendee to compel him to accept titles and pay the purchase money.

"The Court regarded this as a mere money demand, and dismissed the bill on the ground that there was a plain and adequate remedy at law."

See *Farm & Land Co. v. Roseman,* 93 S. C., 350; 76 S. E., 979.

It seems to us that the point under discussion is absolutely concluded by the case of *Hammond v. Foreman,* 48 S. C., 175; 26 S. E., 212, in which the opinion was written by the present Chief Justice. There the action was by the vendor against the vendee, for specific performance of a contract to purchase land. Judge Benet held that the Court of Equity was without jurisdiction, on the ground that the vendor had a plain and adequate remedy at law, and that there were no peculiar features requiring the interference of a Court of Equity. The Court reversed his decree, holding that the remedy of specific performance was within the exclusive jurisdiction of the Court of Equity, as affecting a primary equitable right, in which case the matter of the adequacy of legal relief could not be considered, and practically overruled the case of *Holley v. Anness,* 41 S. C.,

349; 19 S. E., 646, holding to the contrary. *Gregorie v. Bulow (supra)*, was cited and unreservedly approved. See, also, *Walker v. Kee,* 16 S. C., 76. *Blackwell v. Ryan,* 21 S. C., 112. *Kernwood v. Davis,* 21 S. C., 184. *Dinkins v. Simons,* 97 S. C., 261; 81 S. E., 638.

In *Singleton v. Cuttino,* 107 S. C., 465; 92 S. E., 1046, in which the opinion was also written by the learned Chief Justice, it is said:

"The plaintiff has the right to bring an action at law to recover damages for breach of the contract; he also had the right to invoke the aid of the Court in the exercise of its chancery powers. He, however, could not resort to both remedies. He elected to pursue the equitable remedy, and thereafter the jurisdiction of equity was exclusive. In a case of specific performance of contract, the power of the Court to exercise its equitable jurisdiction is not dependent upon the adequacy of the remedy at law."

In the plain case of an executory contract for the sale of real estate, unaffected by any equitable considerations which may militate against a Court of Equity, affording the relief of specific performance in favor of either vendor or vendee, we cannot see any valid reason why the defendant should object to the decree. If the vendor should be the defendant and the vendee should fully comply with his engagements, is the vendee not entitled to have the contract carried out? Why should he be denied that right, and be forced into an action at law for damages? It must be assumed that he contracted to buy the property because he wanted that particular piece of real estate and was willing to pay the owner's price for it. Shall the Court of Equity, which "delights to do equity," shut its doors in his face and remit him to another forum to obtain what he did not contract for and is not satisfied with? Or if the vendee should be the defendant, aside from considerations of right and justice, what possible benefit does he obtain by remitting the vendor to his suit for damages? The suit

·for specific performance would most probably eventuate in a judgment against him for the difference between the contract price and the proceeds of the sale, which in theory and in justice to the vendor, should practically correspond with the difference between the contract price and the market value of the property, the criterion of damages in ·an action at law.

Counsel for appellant are unjustifiably caustic in their characterization of the transaction and the incident rights of the plaintiffs:

"A transaction that is violative of every principle of economic sanity and juristic or moral right. * * * He has already appropriated to himself an asset of $10,000, which in equity and good conscience belongs to the partnership or association. * * * This case presents too many elements of injustice and oppression to commend itself to a Court of equity. * * * Injustice and oppression so glaringly naked. * * * The contrary [accent on the second syllable] purpose and spirit of the present controversy. * * * Every consideration that can ordinarily move the conscience of the Court of Equity to refuse relief is present in this case. * * * The whole gamut of objections to the granting of relief by specific performance seems to be present in the present case."

The breathings of an outraged spirit on behalf of those who have admittedly refused to respond to their solemn business engagements against one who has complied with every ˙stipulation of his contract and whose only offense is in demanding what is lawfully his, and which would have cheerfully been accorded him had a profit been garnered from the "joint adventure." If·there is a single consideration in the case evidencing a violation of juristic or moral right, of injustice, oppression, a perverse spirit or purpose, or a violation of good conscience, we have failed to discover ·it. So far from displaying the whole gamut of objections to the interposition of equitable relief, it does

not display a single one.　The gamut of causes which induce a Court of Equity to withhold relief by way of specific performance includes, among possibly others: Fraud on the part of the party seeking that relief; misrepresentation; mistake on the part of the other; incompleteness or uncertainty of the contract; detriment to the public welfare; lack of mutuality in the contract; laches; change of situation due to delay; breach of trust; unfairness; hardship; illegality; overreaching; imposition; undue influence; betrayal of confidence; recent emancipation of the party by attaining majority.　If the conduct of the plaintiffs in this case has been reprehensible to the slightest degree in the least of these causes, the record fails to disclose it.

But, resting the prayer for this relief upon the discretion of the chancellor, the circumstances of the case demand it. Upon the completion of the executory contract on May 1, 1920, the defendants acquired an equitable interest in the property.　The plaintiffs' hands were tied from that time until December 31st; they could not sell it nor incumber it; they were compelled to hold it subject to the rights of the defendants.　Their condition was parallel to that of the owner of land after verdict in condemnation proceedings and before the condemnor has exercised his right to take it at the assessed valuation. *Haig v. Wateree Co.,* 119 S. C., 319; 112 S. E., 55, where Mr. Lewis in his work on Eminent Domain (3d Ed.) § 742, is quoted with approval as saying:

"From the time of the award, he is practically deprived of his rights to dispose of the land.　His possession is precarious, liable to be terminated at anytime; he cannot safely rent; he cannot safely improve; if he sows he cannot be sure that he will reap."

Notwithstanding that suspension of and incumbrance upon the possession and title of the plaintiffs created by the voluntary contractual action of the defendants, they now claim the right, because real estate declined in value instead of

rising as they anticipated and hoped, to abandon their "joint adventure" and deny their solemn engagement "to become the purchasers of said lands, and to pay for same."

Another consideration showing that the complaint should not be dismissed is this: The complaint certainly shows *prima facie* a proper case for specific performance. The question whether or not it should be granted depends upon the showing to be made by the defendants that there are equitable considerations involved which would justify the refusal of this remedy. That is a matter of defense which should not enter into the decision of the demurrer unless it appeared upon the face of the complaint, which it does not.

Another consideration: If this Court should dismiss the complaint and remit the plaintiffs to their action at law, the program of the defendants is thinly veiled to demur to that complaint upon the ground that the obligation of the subscribers is several, that there is a misjoinder of causes of action, and that the plaintiffs must sue each one of the subscribers, 18 of them, in separate actions. If that demurrer should be sustained, the plaintiff will be forced into a chase, the termination of which probably neither they nor the last survivor of the 18 will ever see.

We do not mean to say that a demurrer under these circumstances should be sustained, but it is a natural result of the appellants' contention that there is no other obligation resting upon the defendants than the several obligation of each one to pay his subscription, and they are not in a position to object to the probable or possible result of the multiplicity of actions, an acknowledge ground of equitable jurisdiction.

It is equally probable that in an action at law the defendants would contest the right of L. S. Welling to recover, upon the ground that he is both obligor and obligee, under the case of *Glenn v. Caldwell,* 4 Rich. Eq., 168. That case holds that, although an action at law could not be sustained

11—S. C. R., 129.

upon such an understanding, the obligations could be enforced in a Court of equity.

The fact that the action at law will be complicated with such foreshadowed and embarrassing c o n t r o v e r s i e s, furnishes an additional reason why the Court of equity should retain its jurisdiction, where its power to do full justice cannot be denied.

We stand with the Supreme Court of the United States in their declaration, like a clarion call, in the case of *Union P. R. Co. v. Chicago, etc., R. Co.,* 163 U. S., 564; 16 Sup. Ct., 1173; 41 L. Ed., 265:

"It is to the higher interest of all * * * that it be understood that there is a binding force in all contract obligations; that no change of interest or change of management can disturb their sanctity or break their force; but that the law * * * is potent to hold them to all their obligations, and so make right and justice the measure of all * * * action."

The judgment of this Court therefore is that the orders appealed from be affirmed.

MR. CHIEF JUSTICE GARY and MR. JUSTICE MARION concur.

MESSRS. JUSTICE WATTS and FRASER dissent.

MR. JUSTICE WATTS (dissenting): This is an action for specific performance, and the appeal is from orders of Judge Shipp refusing to move the cause for trial from Darlington County to Marlboro County, and overruling amended demurrers to the complaint. The exceptions are ten in number, and respondent's attorneys have argued the ten exceptions under six headings.

"There are ten exceptions, some of them with several subdivisions, to the order overruling the demurrer. We think they may be properly classified under six headings:

"(1) That the plaintiffs have no rights under the trust agreement because not in privity therewith.

"(2) That the contracts are speculative and gambling.

"(3) That the contracts are void because made by the plaintiffs on the one hand, and the defendants, together with the plaintiff L. S. Welling, on the other hand.

"(4) That the liability of the defendants is several and limited, and that hence plaintiffs have no equitable cause of action and cannot maintain an action against a number of defendants jointly.

"(5) That specific performance does not lie because the Court cannot enforce the remedy.

"(6) That the plaintiff L. S. Welling is in default."

The fourth and fifth groups of exceptions will be sustained. The second of the documents constituting the contract in the case is an agreement dated April 28, 1920, between the respondents and Crosland & Tyson of the following purport:

"Plaintiffs acknowledge receipt of ten thousand ($10,-000.00) dollars as a payment on the purchase price of the property in question, and agree to execute and deliver a deed in escrow to a bank named, the same to be delivered to Crosland & Tyson on or before January 2, 1921, if Crosland & Tyson pay the balance of the purchase price by the date indicated; Crosland & Tyson are to take title as trustees for themselves and the others who contribute to the purchase price. As security for the balance of the purchase price, plaintiffs are subrogated to the rights of Crosland & Tyson in the trust agreement of April 26, 1920. The obligations under said trust agreement are stated to be several, not joint; each party thereto being liable only for his agreed share of the unpaid purchase price. This agreement is signed only by plaintiffs as sellers and Crosland & Tyson as buyers. No words are added to the signatures of Crosland & Tyson to indicate any agency, trust, or other special relationship toward the other parties thereto."

The provision of the first document governing the trust imposed upon and assumed by Crosland & Tyson is:

"(2) Crosland & Tyson are to hold the sales contract, and after December 31, 1920, to hold the deed for the lands in their own names, but as trustees, for the benefit of the parties to this contract. Said Crosland & Tyson are to make such use or disposition of said land as shall be determined by three-fourths of the parties to this contract, and are to sell the same at auction sale, farm or rent said lands as may be determined by the parties hereto hereafter. It is stipulated and agreed that Crosland & Tyson are to receive from the Wellings a commission of 2½ per cent. out of the original price. It is further agreed that Crosland & Tyson shall receive, if and when the property is sold at public auction sale, commissions on the gross sales of 5 per cent., out of which all expenses of every kind are to be paid by Crosland & Tyson. In the event the said property is not sold at public auction sale, it shall be rented, farmed, or otherwise used as three-fourths in amount of the stockholders of this syndicate shall determine, and Crosland & Tyson bind themselves to carry out all reasonable and proper instructions of three-fourths in amount of the stockholders."

We do not see under the contracts of purchase how the Courts of equity and good conscience in the present case could decree specific performance as asked for. If defendants have breached their contracts, the loss to the plaintiffs is purely pecuniary, and, if the Court were to grant the relief asked for, the result would be a violation of the express agreement of all of the parties to make their obligations for a sum certain and to limit their obligations, absolutely free from liability of one for the defaults and insolvency of the others. Section 3 is as follows:

"(3) It is stipulated that each of the stockholders shall only be liable for the full amount he has agreed to pay into the syndicate. That it is a several obligation, and not a joint one. In case any one of the parties hereto should fully pay and discharge his own obligation, he is not to be called upon for any other or additional sum of money; but it is

understood that, if loss should result from the transaction, the loss is to be equally borne, in proportion to the original subscriptions, which are shown by the following schedule." the equity Court to call for a decree of specific performance. cannot be enforced against them all; if one were to fail to perform that would impose a liability upon the others, which they did not contemplate or contract for.

To allow a decree for specific performance, the Court would have to make and substitute a contract of purchase not made by the parties themselves, but made by the Court.

None of the appellants bound himself for more than $12,500. The claim of plaintiff is a pure legal obligation, and if enforceable must be on the law side of the Court. It is not a case as made by pleadings and exhibits as appeals to the equity Court to call for a decree of specific performacne.

Exceptions should be sustained, order appealed from overruling amended demurrers to complaint reversed, and complaint dismissed.

MR. JUSTICE FRASER (dissenting) : I concur with Mr. Justice Watts, and for the further reason that I do not see how even the Court of equity, with its great power to adjust rights, can decree specific performance.

Take Mr. McColl, to illustrate. He has been good. The record does not show that he has paid or offered to pay, but it would have done no good to him nor the plaintiffs. So far as the record shows, he is ready to pay his $12,500. If he pays his proportion, what is he to get?

The plaintiffs ask to stand on three papers—the contract of sale, the partnership agreement, and their deed to Crosland & Tyson, trustees. It is perfectly manifest that the Court has no right to require the plaintiffs to execute to Mr. McColl a deed to one-twentieth of the land, or one-twentieth interest in the whole tract. It is manifest that the Court can neither require the plaintiffs to execute such a deed or Mr. McColl to accept it, if tendered. The agreement was for a trust deed, and the Court cannot substitute a convey-

ance in fee to Mr. McColl for the equitable interest for which he contracted. It is also manifest that, unless each and every party to the copartnership agreement shall put up his $12, 500, the trust deed will not be delivered and the Court cannot require it. The plaintiffs are asking a Court of equity to allow them to stand on a contract made for their benefit, and to stand on it for the sole purpose of destroying the trust it created. I do not see how the Court of equity can grant the request. That would not be specific performance. It would be making a new contract.

II. It is said that this case is saved from the class of speculative contracts by the provision that, if they shall decide to carry on the business of farming, or renting to tenants, it may be done. I am inclined to think the point well taken, but it in no way helps the cause of the plaintiffs, but, on the contary, is utterly destructive of their right to specific performance.

When the defendants entered into their contract to buy the land and sell again, and share in the profits and losses, they became copartners. *Edwards v. Johnson,* 90 S. C., 90; 72 S. E., 638. When the contract further provided that the land might be used for carrying on farming operations or renting out to tenants, and all profits and losses divided between the parties, there can be no doubt that the defendants became copartners. Now a contract to become partners is not subject to a decree of specific performance. Lindley on Partnership (5th Ed.). Vol. 2, p. 475:

"If two persons have agreed to enter into partnership, and one of them refuses to abide by the agreement, the remedy for the other is an action for damages and not, excepting in the cases to be presently noticed, for specific performance. To compel an unwilling person to become a partner with another would not be conducive to the welfare of the latter, any more than to compel a man to marry a woman he did not like would be for the benefit of the lady."

The excepted cases do not apply here.

The connecting link between the contract to purchase and the deed offered is a copartnership agreement that is not subject of specific performance.   I know of no rule of law or equity, and I certainly am not disposed to establish a rule, that allows a party to a contract, or a party for whose benefit a contract is made, to take such part of a contract or consolidated contract as is for his benefit, and repudiate those features he does not desire.   The plaintiff is seeking to use the copartnership agreement to secure a standing in Court, and then asks the Court to utterly destroy it.   If specific performance be adjudged, and any of the copartners cannot or do not comply, then the interest of such defaulting copartners must be sold.   To whom shall it be sold?   It may be that the purchaser will be one who is *persona non grata* to the others.   What will be the status of the purchaser anyhow?   Does he buy one-twentieth of the land?  No, there is no such agreement.   The Court can only sell the interest of the defaulting partner.   Under the terms of the consolidated contract, upon which the plaintiffs must stand to get any relief, the defaulting partner had the right to one-twentieth of the proceeds of sale of the land, one-twentieth of the profits of the farm, or one-twentieth of the rents, to be determined by the terms of the contract.   The disposition of the property was to "be determined by three-fourths in amount of the stockholders."   Like all copartnerships, the right to manage the business was a matter purely of personal trust and confidence.   That could not be sold and an unacceptable partner cannot be forced upon another. Courts of equity sometimes make their righteous indignation felt by the erring parties to a contract, but it must be remembered that there is one party to this contract upon whom even the plaintiffs cannot frown.   Mr. McColl has made no resistance.   The plaintiff's financial interests are greater, but his (Mr. McColl's) rights are no less sacred to a Court of conscience.   What is to become of Mr. McColl?   He certainly has clean hands.   There is only one way.

Lindley on Partnership (5th Ed.) Vol. 2, p. 475:

"To decree specific performance of an agreement for a term of years would involve the Court in the superintendence of the partnership throughout the whole continuance of the term. As a rule, therefore, Courts will not decree specific performance for a partnership."

This contract may have continued indefinitely. It seems to me that the action, so far as it is for specific performance, should be dismissed. As to the action for damages, it should be transferred to Marlborough County.

Courts of equity have never decreed specific performance in hard cases. The plaintiffs have their land and have always had it. They have also a $10,000 bonus. If they had alleged that they could have sold it to others and the sales (to real purchasers and not other unfortunates) have failed by reason of the violation of this contract to purchase, the position would have appealed to the Court of equity, but they have not so alleged.

Mr. Justice Hydrick, in one of his many excellent opinions, said that Courts should not be ignorant of or refuse to recognize matters of current history that were known to every one.

It has also been said by another "that communities, as well as individuals, go crazy at times." Such a time occurred in 1920. Forty-cent cotton upset us. The boll weevil was rapidly approaching, and the nearer it came the higher went the price of cotton lands. Many of our most progressive and thrifty citizens were obsessed with the idea that cotton would go higher still. Speculation in lands was wild and all too nigh universal. The price of cotton went down and with it the price of land. Lands were not worth the boom prices after the boom had past. Vendors who had contracts of sale demanded the contract price. They came into the Court of equity and demanded that the vendee be required to comply with their contracts. If the Court of equity had ganted their demand, then, as the price of

lands had fallen and the vendee could not pay the boom prices, there would have been a sale of the land at much less than the contract price and a judgment for the deficiency taken. This judgment for a deficiency would, in many instances, have paralyzed the activities of the judgment debtor. This state was in danger of a financial slaughter of its most thrifty citizens. In that emergency the Court of equity said, "No; we will not be a party to this slaughter. We have a discretion in specific performance and we will in our discretion, refuse specific performance. You may go into a Court of law and allow a jury to say what your loss has been. "For once the Courts of law could do justice, when a jury could say how much the vendor had lost; but the Court of equity under specific performance would do a great wrong, bound as it was by the letter of the bond. It was demanded of the Court of equity that it given the pound of flesh, for no other reason than that it was so nominated in the bond. When the Courts of equity shall decree specific performance for no other reason than that it is so nominated in the bond, it should change its name, because it has departed from its traditions and done despite to the memory of its chancellors. The broken contract was not ignored, but the parties were sent to a jury who could say what the vendor had lost.